IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A., etc., | : | |
| | : | |
| Plaintiff, | : | Case No. 3:07cv0449 |
| | : | |
| v. | : | Judge Rice |
| | : | |
| LASALLE BANK NAT'L ASS'N. | : | Magistrate Judge Merz |
| | : | |
| Defendant. | : | |

**MOTION BY DEFENDANT LASALLE BANK NATIONAL ASSOCIATION
FOR SUMMARY JUDGMENT**

Defendant LaSalle Bank National Association ("LaSalle") hereby moves this Court for an Order granting summary judgment in its favor on the plaintiff's claims. The reasons in support of this motion are set forth in the accompanying Table of Contents and Summary of Argument and Memorandum in Support, and include that the plaintiff does not have competent evidence to support essential elements of its claims. No genuine issue of material fact exists, and LaSalle is entitled to summary judgment in its favor on all claims pleaded in Plaintiff's Second Amended Complaint.

Respectfully submitted,

/s/ Loriann E. Fuhrer
Loriann E. Fuhrer (0068037)
Stephanie P. Union (0071092)
Kegler Brown Hill & Ritter
Capital Square, Suite 1800
65 East State Street
Columbus, Ohio 43215-4294
Telephone: (614) 462-5400
Facsimile: (614) 464-2634
lfuhrer@keglerbrown.com
sunion@keglerbrown.com

Gregory A. Markel
Jason M. Halper
Lauren U. Y. Lee
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
greg.markel@cwt.com
jason.halper@cwt.com
lauren.lee@cwt.com

*Attorneys for Defendant Bank of America,
successor by merger to LaSalle Bank
National Association*

## TABLE OF CONTENTS AND SUMMARY OF ARGUMENTS

I.  **INTRODUCTION**.................................................................................................1

II. **FACTUAL STATEMENT**..................................................................................3

III. **LAW AND ARGUMENT**................................................................................8

    A.    LaSalle Is Entitled To Judgment As a Matter Of Law On Plaintiff's Contract Claims.................................................................................................9

        1.    LaSalle Is entitled To Judgment As A Matter Of Law On Plaintiff's Claims Based On Alleged Borrower Misrepresentations (I-a, I-c and II-d)........................................................................10

            a.    The MLPA Does Not Contain A Representation And Warranty That Encompasses The Alleged Borrower Misrepresentations.......................................................11

Plaintiff's claims based on alleged borrower misrepresentations fail because LaSalle never made a representation and warranty as to the accuracy of statements by borrowers in loan application materials. There is no evidence that the parties negotiated for or that LaSalle agreed to effectively guarantee the accuracy of statements made by borrowers, but that is precisely the obligation plaintiff baselessly seeks to impose on LaSalle. The Court may not rewrite the parties' agreement to add provisions where, as here, the contracts already address the issue and extent of LaSalle's representations. *See Morlee Sales Corp.*, 210 N.Y.S.2d 516, 518 (N.Y. 1961) ("It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed" and "[t]he Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing'") (citation omitted).

            b.    LaSalle Also Is Entitled To Judgment On The Additional Ground That There Is No Evidence Supporting Plaintiff's Claims Based On Alleged Borrower Fraud...................................14

RW-13, by its clear terms, applies only where there is a "material default, breach, violation or event of acceleration" by the borrower under the "documents evidencing or securing the Mortgage Loan." Plaintiff has not adduced evidence, however, that there was such a "material default, breach of violation" under the "documents" at issue because the borrowers represented only that the information was accurate "to the best of [their] knowledge." There is no evidence that the borrowers knew, at the time they submitted these documents, that the information contained in them was inaccurate.

With respect to the schedule of real estate owned submitted by Mrs. Rooths, there is also no evidence supporting that the alleged misrepresentation

had a material and adverse affect *on the collateral property*, as required by RW-13. Plaintiff has admitted the value of the subject property would not vary based on the existence or value of any other parcels of real estate owned by the borrower.

2. LaSalle Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim Based On Alleged Building Code Violations (II-b)........................17

a. RW-13 Does Not Apply Where, As Here, Another More Specific Warranty Covers The Subject Matter.............................17

By its terms, RW-13 applies only in the absence of another, more specific warranty. RW-22, which provides that the Seller has no actual knowledge of any pending or threatened actions by any governmental authority against the property, specifically applies to plaintiff's allegations. Therefore, RW-13 is inapplicable. at the time of the securitization, LaSalle had any knowledge of the existence or threat of code violations at the Priest property.

b. Plaintiff Has No Competent Evidence Its Claim...........................19

Plaintiff has not adduced any evidence, as it must to prevail on an alleged violation of RW-22, that, at the time of the securitization, LaSalle had any knowledge of the existence or threat of code violations at the Priest property.

3. LaSalle Is Entitled to Judgment As A Matter Of Law On Plaintiff's Claim Based On The Alleged $20,000 Second Mortgage (II-a) ..............21

In order to be entitled to the repurchase remedy plaintiff seeks in this action, plaintiff must plead and prove that the alleged breach "materially and adversely affect[ed] the value of [the] Mortgage Loan, the related Mortgaged Property or the interests of the Trustee or any Certificateholder in the Mortgage Loan or the related Mortgaged Property." (PSA §2.03(b); Compl., ¶41.) In this case, plaintiff has admitted facts demonstrating the *absence* of any evidence of a material adverse effect by virtue of a second mortgage on the Priest property, and its claim must therefore fail.

4. LaSalle Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claims Under RW-13 Based On The Borrowers' Alleged Failure To Make Repairs Called For In Repair Letters (I-b and II-c).......................22

Plaintiff alleges the borrowers failed to make repairs called for under repair letters and that, as a result, they were in breach of the "documents evidencing or securing the Mortgage Loan" on March 30, 2006 when the securitization closed, constituting a breach by LaSalle of RW-13. LaSalle is entitled to judgment as a matter of law on these claims because, with respect to most of the listed repairs, there is no evidence to support plaintiff's assertion that the repairs were not completed by the borrowers prior to the close of the securitization on March 30, 2006, the relevant date under RW-13. With respect to

#4827-8073-0627 v1

any repairs that arguably were not made, there is no evidence that any such failure to make a repair "materially and adversely affect[ed] the value of the Mortgage Loan and the related Mortgaged Property," as required by RW-13.

5.      LaSalle Is entitled to Judgment As A Matter Of Law On Plaintiff's Claims Based On Deficient Underwriting (I-d and II-e)..........................28

Plaintiff's claims based on RW-23 also fail because RW-23 does not apply to LaSalle's underwriting practices and plaintiff does not challenge any practices covered by RW-23. *Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co.*, 94 N.Y.2d 398, 404, 727 N.E.2d 563 566-67 (2000) (standard rule of contract construction that interpretations that render certain provisions meaningless are disfavored) *Fox Paper Ltd. v. Schwarzman*, 168 A.D.2d 604, 605, 563 N.Y.S.2d 439, 441 (2d Dep't 1990) ("the proper aim of the court, which may not rewrite the contract, is to arrive at a construction which will give meaning to all of the language employed by the parties"); Restatement (Second) of Contracts § 203, at 93 (1981) ("an interpretation is strongly negated if it would render some provisions superfluous"); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'").      LaSalle is entitled to judgment on plaintiff's claims for violations of RW-23 with respect to the Rooths Loan on the additional ground that plaintiff failed to provide defendant with prompt notice of the claim, as required under the relevant contracts. *Lehman Bros. Holdings, Inc. v. Laureate Realty Services, Inc.,* Case No. 1:04-cv-1432, 2007 WL 2904591, at *13, 2007 U.S. Dist. LEXIS 76940, at *33-34 (S.D. Ind. September 28, 2007); *Morgan Guaranty Trust Co. of N.Y. v. Bay View Franchise Mort. Acceptance Co.*, No. 00 Civ. 8613, 2002 WL 818082, at *10, 2002 U.S. Dist. LEXIS 7572, at *17 (S.D.N.Y. April 30, 2002); *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994) (in sending a first demand, plaintiff has an obligation to "pick up the scent and nose to the source").

B.      Defendant Is Entitled To Summary Judgment On Counts III And IV Of Plaintiff's Complaint..........................................................................................34

In Counts III and IV of the Complaint, plaintiff asserts claims of fraud and negligent misrepresentation based on a single statement contained in an Asset Summary Report noting that an HVAC inspection would be required as a condition to loan closing. These claims fail for several reasons.

1.      There Is No Evidence Of Intent Sufficient To Prove Plaintiff's Fraud Claim.......................................................................................................36

To prove its fraud claim, plaintiff must demonstrate that LaSalle acted with an intent to deceive plaintiff, Forum or other Certificateholders regarding whether an HVAC inspection would be conducted or a holdback required. *See*

*New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 319, 662 N.E.2d 763 (N.Y. 1995); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec. LLC*, -- F. Supp.2d --, No. 05 Civ. 9016 (SAS), 2009 WL 29649, **8-9, 16 (S.D.N.Y. Jan. 5, 2009). Because there is no evidence that LaSalle acted with an intent to deceive, LaSalle is entitled to judgment as a matter of law.

2.     Plaintiff Cannot Demonstrate Actual Reliance As Required To Prevail On Its Fraud And Negligent Misrepresentation Claims......................................................................................................38

LaSalle is entitled to judgment as a matter of law on plaintiff's fraud and negligent misrepresentation claims because plaintiff cannot establish that it *actually relied* on an alleged misstatement to its detriment. *King*, 111 F.3d at 258; *Korea Life Ins.*, 269 F. Supp. 2d at 437; *Oppenheimer-Palmieri Fund, L.P., v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.*, 802 F. Supp. 804, 811-12 (S.D.N.Y. 1992); *K. Capolino Constr. Corp. v. White Plains Hous. Auth.*, 655 N.Y.S. 2d 622, 623 (N.Y. App. Div. 1997).

Here, there is absolutely no evidence that any investor actually relied on the statement at issue in the Asset Summary regarding whether an HVAC inspection would be required in determining whether to include the Priest Loan in the Trust or purchase MF2 Certificates.

3.     Reliance On The Asset Summary Report Would Not Have Been Reasonable Or Justifiable.........................................................................39

Even if plaintiff could demonstrate actual reliance on the statement in the Asset Summary regarding the HVAC inspection, which it cannot, any such reliance would not be reasonable or justifiable, as required to prove fraud or negligent misrepresentation under prevailing New York law. "[Where the plaintiff has the means] of knowing, by the exercise of ordinary intelligence, the truth . . . of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Schumaker v. Mather*, 30 N.E. 755, 757 (N.Y. 1892); *Giannacopoulos v. Credit Suisse*, 37 F. Supp. 2d 626, 632-33 (S.D.N.Y. 1999); *Rudnick v. Glendale Sys. Inc.*, 635 N.Y.S. 2d 657, 658 (N.Y. App. Div. 1995).

Sophisticated business entities cannot claim justifiable reliance where they had (1) full access to critical information; and (2) could have discovered the truth simply by asking for the information, but did not. *Banque Arabe,* 57 F.3d at 157; *Compania Sud-Americana,* 785 F. Supp. at 419; *Belin v. Weissler*, No. 97 Civ. 8787, 1998 WL 391114, at *5 (S.D.N.Y. July 1998); *Emergent Capital*, 165 F. Supp. 2d at 624; *Evans v. Israeloff, Trattner & Co.*, 617 N.Y.S. 2d 899, 900 (N.Y. App. Div. 1994).

Here, there is no dispute that plaintiff had access to documentation of the waiver of the HVAC inspection requirement, and had access to LaSalle such that it could ask all questions it might have had about whether the inspection actually took place and what the results might have been. It follows, then, that plaintiff's alleged reliance on the ASR was neither reasonable nor justified as a matter of law.

4.      There Is No Fiduciary Or Special Relationship Between LaSalle and
        Forum ........................................................................................................41

To prevail on a negligent misrepresentation claim, the plaintiff must establish the existence of a special relationship giving rise to a duty on the part of LaSalle to plaintiff. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 188-89 (2nd Cir. 2004); *Congress Fin.*, 790 F. Supp. at 474; *PPI Enters.*, 2003 WL 22118977, at *25-26; *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 400-01 (S.D.N.Y. 2004).

The parties here had no relationship other than an arms-length business relationship. There is absolutely no evidence of any extra-contractual relationship between the parties that would rise to the level of a fiduciary or special relationship. Therefore, plaintiff's negligent misrepresentation claim fails.

C.      Plaintiff's Claims For Specific Performance Fail...................................44

Plaintiff asks the court to enter judgment "[e]nforcing the MLPA and PSA by requiring LaSalle to repurchase the Rooths Loan and the Priest Loan from the Trust as specified in PSA §2.03(b) and MLPA §6(e) at the Repurchase Price." This requested remedy fails because plaintiff has an adequate remedy at law in the form of money damages. *FJE Corp. v. Northville Inds. Corp.*, 198 F. Supp. 2d 249, 270 (E.D.N.Y. 2002) (*citing U.S. Fidelity and Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 921 (E.D.N.Y. 1999); *Hadcock Motors, Inc. v. Metzger*, 459 N.Y.S. 2d 634, 636-37 (4th dep't 1983). Where money damages are adequate to compensate plaintiff for an alleged breach of contract, the extraordinary remedy of specific performance is not available. *Lucente v. Int'l Business Machines Corp.*, 310 F.3d 243, 262 (2nd Cir. 2002).

IV.    **CONCLUSION**...........................................................................................45

**CERTIFICATE OF SERVICE**..............................................................................46

**INDEX OF ATTACHMENTS**................................................................................47

<u>**MEMORANDUM IN SUPPORT**</u>

## I. INTRODUCTION

This action arises out of the purchase by an extremely sophisticated investment company, Forum Mortgage Advisors, LLC ("Forum"), of the riskiest, but also potentially most profitable, mortgage-backed securities issued in connection with a mortgage securitization in 2006. Plaintiff, acting at the behest of the special servicer appointed by Forum, seeks to impose on LaSalle Bank National Association ("LaSalle") the obligation to compensate Forum and other certificateholders for losses on their certificates as a result of borrower non-payment on mortgages in the securitization trust. Plaintiff seeks such relief from LaSalle notwithstanding that:

- Forum and the other Certificateholders are sophisticated investment businesses and financial institutions that knowingly assumed the risk of and for years made substantial profits by investing in such securities.

- There was a severe and unprecedented meltdown in the world-wide mortgage markets beginning in mid-2007, which caused declines in the value of virtually all mortgage-backed securities, including the Certificates owned by Forum.

- Forum had the opportunity, which it took advantage of, to conduct due diligence on any and all loans proposed for securitization by LaSalle, and determined to accept 98% of the loans proposed by LaSalle, including the two at issue here, after reviewing, among other things, the contents of the loan file (i.e., the same information available to LaSalle when it made the loans).

- Forum acquired the riskiest of the Certificates, and therefore, knowingly assumed the greatest risk in this transaction in exchange for certain rights not enjoyed by other Certificateholders and the possibility of a greater return on its investment.

Rather than acknowledge its responsibility for the investment decisions it made, Forum and its hand-picked special servicer, Crown Northcorp ("Crown"), effectively seek to make LaSalle a guarantor in this case, and thereby to assume a contractual obligation to which it never agreed, against non-payments by any borrower on any loan originated and then securitized by LaSalle. Plaintiff also continues to pursue a claim for common law fraud against LaSalle even though there is no evidence whatsoever that LaSalle acted with the required intent to deceive

plaintiff in connection with this securitization transaction.

In particular, in a mortgage-backed securities transaction such as at issue here, mortgage loans are originated by a lender (here defendant LaSalle) and sold to an entity (here LaSalle Commercial Mortgage Securities, Inc. ("LaSalle Commercial")) pursuant to a mortgage loan purchase agreement ("MLPA") (David Abshier Dep. Ex. 59.) LaSalle Commercial, in turn, pursuant to a Pooling and Servicing Agreement ("PSA") (Ex. A to Loriann E. Fuhrer Aff.), deposited the loans into the LaSalle Commercial Mortgage Securities, Inc. Commercial Mortgage Pass-Through Certificates, Series 2006-MF2 (the "Trust") and transferred all right, title and interest in the loans to the Trustee (here plaintiff Wells Fargo Bank, N.A. ("Wells Fargo")). The loans were acquired with the proceeds from the issuance of certificates ("Certificates") sold to investors and representing an interest in the Trust ("Certificateholders").

The Certificates had different risk profiles based on their particular interest in the Trust, and were rated by Moody's Investor Service, Inc. ("Moody's") and Fitch, Inc. ("Fitch") to reflect their differing risk characteristics. Forum acquired the lowest rated Certificates, connoting the highest risk but also the potential for the highest return. By acquiring at least 25% of the most subordinate class of regular Certificates, Forum also became the "Controlling Class" under the PSA, which conferred on it certain rights and privileges not enjoyed by other Certificateholders. Among these rights were the ability to appoint the special servicer, in this case Crown, and to "direct the Special Servicer to take, or to refrain from taking, such other actions with respect to a Mortgage Loan, as the Controlling Class Representative may deem advisable." (PSA §6.07.) Forum also had the opportunity to conduct independent due diligence on all the loans which LaSalle proposed to securitize, and to exclude loans from the Trust if it so chose. In other words, each and every loan securitized in this transaction was investigated by Forum, which then determined to include all but 2% of the loans proposed by LaSalle, including the loans at issue in

this action.

In the MLPA, LaSalle made thirty-eight separate representations and warranties concerning numerous different aspects of this securitization transaction. Nowhere, however, did LaSalle make any guarantee against borrower non-payment, nor did LaSalle warrant the accuracy of any statements made by its borrowers. Moreover, only three of these thirty-eight representations are even alleged to have been breached, and as explained below, plaintiff is distorting the MLPA to attempt to apply these representations to the statements and conduct at issue here. In fact, and as the evidence below demonstrates, this case was not brought by plaintiff to remedy harm caused by a breach of a representation or warranty. Instead, the mortgage markets dived, and plaintiff by virtue of this action is manipulating the representations and warranties in the MLPA to attempt to make LaSalle responsible for losses that are appropriately borne by Forum and other Certificateholders.

The evidence in this case overwhelmingly demonstrates as a matter of law that LaSalle is not liable on any claims in the Complaint, and plaintiff certainly has not adduced evidence sufficient to establish a genuine issue of material fact sufficient to defeat summary judgment. Accordingly, the Court should grant LaSalle's motion for summary judgment and dismiss the claims in the Complaint.

## II.    FACTUAL STATEMENT

### A.    The Parties

The Trustee for the Certificateholders of the Trust is Wells Fargo, a national banking association with its principal place of business in California ("Trustee"). (Compl. ¶17, PSA p. 1.) Under the PSA and MLPA, GMAC Commercial Mortgage Corporation, now Capmark Finance Inc. ("Capmark") was identified as the Master Servicer. (PSA, p. 25; MLPA, p. 1; Roy

Owen Dep. at 68.)[1] Crown, a Delaware corporation with its principal place of business in Ohio, was identified as the Special Servicer for the Trust under the PSA and the MLPA. (Compl. at ¶18; PSA p. 50; MLPA, p. 1.)

LaSalle, formerly a national banking association with its place of business in Illinois, is the seller of the mortgage loans which comprise the pooled mortgage assets of the Trust. LaSalle Commercial, a Delaware Corporation, is the Purchaser of the loans under the MLPA and the Depositor of the loans under the PSA. (Compl. at ¶19; Answer, ¶19; PSA, p. 1; MLPA, p. 1.) Effective October 1, 2007, LaSalle was acquired by Bank of America Corp. (Answer, ¶19.)

B.    LaSalle's MFG Program And The MF2 Securitization

Beginning in 1995 and continuing until early 2008, the multifamily finance group within LaSalle ("MFG") originated, underwrote and approved loans of less than $5 million, secured predominantly by multifamily dwellings. In December of 2005, LaSalle securitized its first pool of small balance multifamily loans. On March 30, 2006, LaSalle closed its second securitization of such loans, commonly referred to as "MF2." This lawsuit concerns two MF2 loans from among the approximately five hundred (500) which LaSalle originated and securitized—one made to borrower Bonita Rooths and secured by property in Dayton, Ohio (the "Rooths Loan") and one made to borrower Ryan Priest and secured by property in Biddeford, Maine (the "Priest Loan").

Prior to closing the MF2 securitization, LaSalle made its complete loan underwriting files available to investors for their review. (Geoffrey Hawkins Dep. at 34-35.) The investors in the MF2 Certificates uniformly are sophisticated financial and other institutions well aware of the risks and potential returns available from such investments. One such sophisticated buyer, Forum, purchased the riskiest, lowest-rated, first-loss—but also potentially the most profitable—

---

[1] The depositions cited in this Memorandum have all been filed with the court. Cited testimony, unless contained in a deposition filed under seal, is provided in the Attachments hereto. Cited deposition exhibits are also contained in the Attachments. Please refer to the Index of Attachments appearing as the last page of this document.

Certificates (commonly known as the "B-piece"), and had the right to and did conduct considerable due diligence on the loans proposed by LaSalle to be included in the MF2 securitization. (*Id*. at 15-16; Owen Dep. at 283.) The B-piece investor, by virtue of owning the riskiest (but also potentially more profitable) Certificates, typically performs due diligence and negotiates with the seller regarding which loans will ultimately comprise the securitized pool. (Hawkins Dep. at 15-16.)

Geoffrey Hawkins, formerly a Forum executive, was among those responsible for investor due diligence on MF2. (*Id*. at 15.) Mr. Hawkins testified regarding Forum's due diligence as follows:

> We would get documentation from a proposed loan pool from the seller. In this case it was LaSalle, and we would review the documents of loans and the information we were given. We would go back and ask questions, and we would decide whether the loan belonged in the Pool or not.

(*Id*. at 18.) On loans where the borrower's FICO score was less than 680, like the Rooths and Priest Loans, Forum gave particular scrutiny to the documentation in loan underwriting file, as explained by Mr. Hawkins: "I can tell you right now this is a FICO of 624, we pulled this loan file apart. . . . I can tell you that the file was pulled apart. It was below a 680, it got pulled apart." (*Id*. at 213-14.)

Within the loan files, Forum had available to it all the information available to LaSalle regarding the loans, including information relating to the borrower's credit score, credit history and resources, and information relating to the age, condition and cash flow of the collateral properties. (Valerie Scalise Dep. at 136; Hawkins Dep. at 35.) Forum, through its attorney, also participated in drafting the Offering Memorandum for MF2, which contained several hundreds of pages of information relating to the MF2 pool, including seventeen pages of "risk factors." (Hawkins Dep. at 191-93 and Ex. 224 thereto; Ex. D to Fuhrer Aff.). Once Forum had reviewed the loan information in detail, it would engage in ongoing dialogue with LaSalle to address any and all questions Forum had about particular loans. (Hawkins Dep. at 158.) By the time the

MF2 loans were securitized, Forum had available to it at least as much information as LaSalle in making its decision whether to retain in the securitization pool the loans proposed for inclusion.

Ultimately, if Forum objected to including a loan, it had a number of options. One option was to "kick-out" the loan, or remove it from the pool. (*Id*. at 158.) If Forum had concerns about one or more loans but chose to leave them in the pool, it had other "cures" available to it, such as negotiating better pricing, or negotiating the subordination levels in the pool to provide a higher return to the B-piece investor. (*Id*. at 158-161.) Mr. Hawkins testified, however, that Forum had a goal of maximizing the size of the loan pools it invested in, because Forum had money it needed to invest. (*Id*. at 181.) Consistent with that goal, Forum sought to maximize its profits by including in the pool the largest number of loans possible: "I believe that LaSalle and Forum Partners have the common goal of maximizing the size of the pool while maintaining an appropriate level of risk. We have worked hard on finding ways to include as many loans as possible and we view the list of loans below as a successful result of our due diligence process." (*Id*., Ex. 65.) In the case of MF2, Forum conducted due diligence, kicked out a small number (less than 2% of the principal balance) of loans, agreed to leave the remaining loans in the pool, and closed the MF2 transaction on March 30, 2006. Although Rooths and Priest had known FICO scores among the lowest of the borrowers whose loans were proposed for the MF2 pool, Forum chose to keep the loans in the pool as part of the MF2 securitization.

Sometime after the Rooths and Priest Loans were securitized in the MF2 pool, these borrowers defaulted in making payments on their loans. Plaintiff, through Crown, demanded that LaSalle substitute new loans for, or repurchase, the two loans. LaSalle refused, disagreeing that the payment defaults were caused by any breaches of representations and warranties contained in the MLPA, as plaintiff alleged, and this litigation followed.

C.    Overview Of Plaintiff's Claims

The Second Amended Complaint (the "Complaint") contains four counts. Count I alleges breach of warranty with respect to the Rooths Loan; Count II alleges breach of warranty

with respect to the Priest Loan; and Counts III and IV allege fraud and negligent misrepresentation with respect to the Priest Loan. Within each of Counts I and II, plaintiff alleges several instances of breach of warranty. The claimed breaches of representations and warranties ("RW") presented in Count I are as follows:

I-a    Breach of RW-13 based on alleged material inaccuracies in the statement of real estate owned submitted by Mrs. Rooths during the loan application process (Compl. ¶34(a) and ¶53(a); Owen Dep. Ex. 30);

I-b    Breach of RW-13 based on Mrs. Rooths alleged failure to perform repairs listed in a repair letter (Compl. ¶34(b) and ¶53(b); Owen Dep. Ex. 44);

I-c    Breach of RW-13 based on alleged materially false information contained in a rent roll submitted by Mrs. Rooths (Compl. ¶34(c) and ¶53(c); Owen Dep. Ex. 35); and

I-d    Breach of RW-23 based on alleged deficiencies in LaSalle's underwriting of the Rooths loan (Compl. ¶35 and ¶54).

The claimed breaches of warranty presented in Count II are as follows:

II-a    Breach of RW-6 based on the alleged existence of a second mortgage on the Priest property (Compl. ¶37 and ¶60(a); Owen Dep. Ex. 27);

II-b    Breach of RW-13 based on the alleged presence of code violations at the Priest property (Compl. ¶38(a) and ¶60(b)(1); Owen Dep. Ex. 28);

II-c    Breach of RW-13 based on Mr. Priest's alleged failure to perform repairs listed in a repair letter (Compl. ¶38(b) and ¶60(b)(2); Owen Dep. Ex. 25);

II-d    Breach of RW-13 based on alleged false information contained in a certified operating statement submitted by Mr. Priest (Compl. ¶38(c) and ¶60(b)(3); Owen Dep. Ex. 12); and

II-e    Breach of RW-23 based on alleged deficiencies in LaSalle's underwriting of the Priest Loan (Compl. ¶39 and ¶60(c)).

In connection with these claims for alleged breaches of representations and warranties, plaintiff seeks to invoke the remedy proscribed in Section 2.03(b) of the PSA, which provides in relevant part:

If any Certificateholder, the Master Servicer, the Special Servicer, the Paying Agent or the Trustee discovers . . . a breach of any representation or warranty with respect to a Mortgage Loan set forth in . . . the Mortgage Loan Purchase Agreement (a "<u>Breach</u>"), which . . . Breach . . . *materially and adversely affects the value of such Mortgage Loan, the related Mortgaged Property or the interests of the Trustee or any Certificateholder in the Mortgage Loan or the related Mortgaged Property*, [the special servicer shall request in writing that the Mortgage Loan Seller] . . . (i) cure such Defect or Breach, as the case may be, in all material respects, (ii) repurchase the affected Mortgage or REO Loan at the applicable Purchase price and in conformity with the Mortgage Loan Purchase Agreement and this Agreement or (iii) substitute a Qualified Substitute Mortgage Loan for such affected Mortgage Loan or REO Loan.

In this case, plaintiff seeks an order requiring LaSalle to repurchase the Rooths and Priest Loans. For the reasons set forth below, however, plaintiff is not entitled to this or any other relief sought in this action. Rather, LaSalle is entitled to judgment as a matter of law on all claims in the Complaint.

## III. LAW AND ARGUMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is mandated where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court must grant summary judgment against a party which "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party's burden "may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382 (6th Cir. 1993); *Moore v. Philip Morris Cos.,* 8 F.3d 335 (6th Cir. 1993). "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed

fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street*, 886 F.2d at 1479 (citations omitted).[2]

As will be discussed below, under the applicable legal standards, summary judgment should be granted in favor of LaSalle.

A.    LaSalle Is Entitled To Judgment As A Matter Of Law On Plaintiff's Contract Claims

Plaintiff bears the burden to prove its breach of contract claim by a preponderance of the evidence. *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 542 (2nd Cir. 1989); *Weschsler v. Hunt Health Systems, Ltd.*, 330 F.Supp. 2d 383, 403 (S.D.N.Y. 2004), *recons. denied*, No. 94 Civ. 8294 (PKL), 2004 WL 221026 (S.D.N.Y. Sept. 30, 2004).

New York law governs the construction of the MLPA and the PSA.  (MLPA, §11; PSA §11.04.)  It is well-settled New York law that "'when the meaning of [a] . . . contract is plain and clear . . . [it is] entitled to [be] enforced according to its terms.'" *Uribe v. Merchants Bank*, 341, 670 N.Y.S.2d 393, 396 (N.Y. App. Div. 1998) (citation omitted).[3] "The parties' intention should be determined from the language employed."  *Wallace v. 600 Partners Co.*, 618 N.Y.S.2d 298, 300 (N.Y. App. Div. 1994) (citation omitted), *aff'd*, 634 N.Y.S.2d 669 (1995). In other words, "it is incumbent on the court, when interpreting a contract, to give the words and phrases contained therein their ordinary, plain meaning" (*id.* at 302).

---

[2] A Rule 56 movant need not produce evidence to disprove the opponent's claims, but rather must demonstrate the absence of any genuine issues of material fact with respect to such claims.  *Celotex*, 477 U.S. at 322 (1986).  "The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Street*, 886 F.2d at 1480 (citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.").  "Once the moving party meets its initial burden, the burden shifts to the nonmoving party to set forth facts showing a triable issue of material fact." *Bridgeport Music Inc. v. WB Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007) (citation omitted).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2007).

[3] *See also Breed v. Insurance Co. of N. Am.*, 413 N.Y.S.2d 352, 355 (N.Y. 1978) ("'[i]t is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties <u>as expressed in the unequivocal language employed</u>'") (emphasis added) (citations omitted).

Likewise, it is well settled that "'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" *W.W.W. Assocs., Inc. v. Giancontieri*, 565 N.Y.S.2d 440, 443 (N.Y. App. Div. 1990) (citation omitted); *see also id.* ("[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing"); *R/S Assocs. v. New York Job Dev. Auth.*, 744 N.Y.S.2d 358, 360 (N.Y. App. div. 2002). The rule has even greater force "where commercial certainty is a paramount concern" and where, as here, the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length. *Wallace v. 600 Partners Co.*, 634 N.Y.S.2d 669, 671 (N.Y. 1995) (citations omitted).

Applying the foregoing principles, LaSalle is entitled to judgment as a matter of law on plaintiff's contract claims alleging breaches of representations and warranties.

1.   <u>LaSalle Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claims Based On Alleged Borrower Misrepresentations (I-a, I-c and II-d)</u>

In the claims identified above as I-a, I-c and II-d, plaintiff alleges that LaSalle breached RW-13 <u>not</u> based on its own conduct, knowledge or disclosure, but because *borrowers Rooths and Priest defrauded LaSalle* by allegedly making certain false statements on their loan applications.  LaSalle is entitled to judgment as a matter of law on this claim because LaSalle never made a representation or warranty as to the accuracy of statements by borrowers in loan application materials.  It follows that if LaSalle made no representation applicable to such borrower statements, LaSalle could not have breached a representation by virtue of any statement by Rooths or Priest in connection with applying for loans.  Stated differently, there is no evidence that the parties negotiated for, or that LaSalle agreed to, effectively guarantee the accuracy of statements made by borrowers, but that is precisely the obligation plaintiff baselessly seeks to impose on LaSalle at this time.  Moreover, even *if* RW-13 covered misrepresentations made by borrowers in materials submitted during the application process, plaintiff has admitted it

lacks evidence to establish essential elements of a breach of RW-13 based on such borrower statements.

a.   The MLPA Does Not Contain A Representation And Warranty
     That Encompasses The Alleged Borrower Misrepresentations

In order for LaSalle to have breached a representation and warranty based on alleged misrepresentations by borrowers, LaSalle must have represented and warranted the accuracy of such statements in the first place.  The MLPA, however, contains no such provision.  In fact, Exhibit B to the MLPA contains thirty eight (38) separate  heavily negotiated representations and warranties from LaSalle relating to the securitized Mortgage Loans covering numerous different aspects of the transaction, but nowhere does LaSalle make any representation whatsoever regarding the borrowers, including any representation as to the accuracy of statements in borrowers' loan application materials.  The parties to the MLPA were free to negotiate and to determine their agreed-upon allocation of risks through the inclusion of representations and warranties by LaSalle.  The absence of a representation and warranty allocating to LaSalle the risk of borrower misrepresentation is fatal to plaintiff's claims based on such alleged misrepresentations.

Tacitly conceding the absence of such a representation and warranty in the MLPA, and in an effort to manufacture a claim where none exists, plaintiff asserts that borrower misrepresentations in application materials are subject to RW-13, which provides as follows:

> There exists no material default, breach, violation or event of acceleration (and, to Seller's knowledge, no event which, with the passage of time or the giving of notice, or both, would constitute any of the foregoing) *under the documents evidencing or securing the Mortgage Loan, in any such case to the extent the same materially and adversely affects the value of the Mortgage Loan and the related Mortgaged Property*; provided, however, that this representation and warranty does not address or otherwise cover any default, breach, violation or event of acceleration that specifically pertains to any matter otherwise covered by any other representation and warranty made by the Seller.  (Emphasis added.)

On its face, RW-13 is implicated only by "documents evidencing or securing the Mortgage Loan."  Based on the plain meaning of these terms, materials associated with borrower

loan applications do not constitute documents evidencing or securing the Mortgage Loan. To the contrary, there is no "Mortgage Loan" unless and until LaSalle and borrower reach agreement on the terms of such a loan and execute a completely different set of documents, such as promissory notes, which "evidence" the Mortgage Loan, and mortgages, which "secure" the Mortgage Loan. The Loan Application materials represent nothing more than an offer to contract, and therefore, certainly are not evidence of the contract (i.e., the Mortgage Loan) itself. Moreover, common sense dictates that the allegedly false Priest income and expense statement (Owen Dep. Ex. 12) and the Rooths certified rent roll (Gembara Dep. Ex. 35) do not "evidence" or "secure" the mortgage loan. For example, it is not possible to determine from the income and expense statement or the certified rent roll whether a loan was ultimately made, so it is clear they do not "evidence" the loans. Nor is it feasible to determine from the income and expenses statement or the certified rent roll what security, if any, was provided for the loan. Thus, they do not "secure" the mortgage loan.

Such a conclusion is also compelled by the plain language of the PSA, which defines Mortgage Loan without reference to borrower application materials. A "Mortgage Loan" refers to the loans securitized in MF2 and includes the "Mortgage Note, Mortgage and other documents contained in the related Mortgage File and any agreements." "Mortgage", in turn, for instance, is defined as the "mortgage, deed of trust or other instrument securing a Mortgage note and creating a lien on the fee and/or leasehold interest in the related Mortgaged Property." Likewise, the "mortgage file" is expressly defined in the PSA to constitute various documents, such as the original executed mortgage note, the mortgage, evidence of lease assignments, guarantees, environmental indemnities, and the like. No reference is made to borrower application materials. Under New York law, several documents form one integrated document when they are executed contemporaneously as part of the same transaction. *See Albany Insurance Co. v. Banco Mexicano, S.A.*, No. 96 Civ. 9473, 1998 WL 730337, at *2 (S.D.N.Y. Oct. 19, 1998) ("instruments executed at the same time, by the same parties, for the same purpose and in the

course of the same transaction will be read and interpreted together"), *aff'd*, 182 F.3d 898 (2d Cir. 1999), *cert. denied*, 528 U.S. 1080 (2000).  The application materials were not executed at the time of the mortgage loan and, therefore, do not evidence or secure it.

Plaintiff was well aware of the fact that the MLPA does not provide a basis for this claim in May of 2007, when Roy Owen of Crown was preparing to send notices of alleged breach to LaSalle, as demonstrated by a telling email exchange between Mr. Owen and Crown's Steve Brown.  On May 15, 2007, Mr. Owen sent Mr. Brown a copy of the loan approval letter in the Rooths matter, with the following message:  "Here's what LaSalle's loan approval letter looks like.  The borrower signs agreeing to a lot of stuff, but no certification as to the accuracy of application information except a provision allowing LaSalle to refuse to make the loan if an inaccuracy is discovered."  (Owen Dep. at 136-37, Ex. 160.)  Mr. Brown responded that same day:  "Agreed."  (*Id.*)

In short, RW-13 has no application to statements by borrowers in loan application materials, and plaintiff knows as much.  What plaintiff actually is seeking is for the Court to rewrite the MLPA to impose on LaSalle a representation it never agreed to and for which it was never compensated.  It is well settled, however, that the Court may not, as plaintiff advocates, rewrite the parties' agreement to add provisions where, as here, the contracts already address the issue and extent of LaSalle's representations.  *See Morlee Sales Corp.*, 210 N.Y.S.2d 516, 518 (N.Y. App. Div. 1961) ("It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed" and "[t]he Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing'") (citation omitted).

Because there is no representation or warranty in the MLPA that places on LaSalle the risk of fraud or misrepresentation by the borrower during the application process, LaSalle is entitled to judgment as a matter of law on plaintiff's claims I-a, I-c and II-d.

Even assuming, contrary to its plain meaning, that RW-13 somehow is construed so as to make LaSalle a guarantor of the accuracy of statements in loan application materials submitted by borrowers, LaSalle still is entitled to judgment as a matter of law on claims I-a, I-c and II-d. RW-13, by its clear terms, applies only where there is a "material default, breach, violation or event of acceleration" by the borrower under the "documents evidencing or securing the Mortgage Loan." Plaintiff has not adduced evidence, however, that there was such a "material default, breach of violation" under the "documents" at issue—the Rooths rent roll and the Priest income and expense statement. Rather, these borrowers provided information represented to be accurate only "to the best of [their] knowledge," but there is no evidence that the borrowers knew, at the time they submitted these documents, that the information contained in them was inaccurate. Because the borrowers could only have "breached" their loan application documents by *knowingly* submitting incorrect information, and there is no evidence of such willful misconduct, the statements in the borrowers' application materials cited by plaintiff would not trigger a violation of RW-13 even if it applied, which it does not.

Specifically, in the income and expense statement dated May 27, 2005, Priest stated: "I certify, to the best of my knowledge, under penalty of perjury that the information herein is true and accurate as of: 5/27/05." (Owen Dep. Ex. 12.) Plaintiff's corporate representative, Roy Owen, testified in his deposition that he had no knowledge that this statement was false:

> Q.      And he certifies to the best of my knowledge, the information is true and correct, yes?
>
> A.      Correct.
>
> Q.      Do you have any information or facts that would indicate that Ryan Priest at the time that he made that certification had knowledge that that information was incorrect?
>
> A.      . . . [N]o, I don't know what was in Ryan Priest's mind at the time that he signed this.
>
> Q.      You don't know what he knew at that time?

A.     No.

(Owen Dep. at 128-129.)

Similarly, the multifamily rent roll Rooths signed on April 25, 2005, states: "I certify, to the best of my knowledge, under penalty of perjury that the information herein is true and acurate (sic) as of: 4/25/05." (Miguel Dep. Ex. 35, p. 3.) Mr. Owen testified in his deposition that plaintiff likewise does not have any evidence to support that Mrs. Rooths was aware of any inaccuracy in the rent roll at the time she submitted it. He testified as follows:

> Q.     . . . With respect to the rent roll that's alleged to contain misinformation, do you contend that she was aware of that misinformation at the time?
>
> A.     All I know is that she signed it and said that is was under penalty of perjury true and correct.
>
> Q.     You don't have any specific facts that she had knowledge at the time that -- that it was incorrect?
>
> A.     I do not know what was in her mind at the time she executed that certified rent roll.
>
> * * *
>
> Q.     You don't know what she knew or didn't know?
>
> A.     Correct.

(Owen Dep. at 123-125.) In the absence of evidence that Priest or Rooths had knowledge of the inaccuracy of information submitted, plaintiff cannot prove Priest or Rooths "breached" the certification, requiring entry of judgment in favor of LaSalle on plaintiff's related contract claims.

Plaintiff's claim based on the Rooths schedule of real estate owned (that Rooths' representation she owned 100% of three single-family residences "jointly" should have stated she owned "50%" of them) fails for two additional reasons. First, a breach of RW-13 requires evidence of a "*material* breach, default, violation or event of acceleration" by the borrower. Here, even if Rooths' representation of her interest in three other properties as "joint" is considered to be inaccurate because in actuality she owned only a 50% share in such properties, the undisputed evidence establishes that the information Rooths provided was not *material* to

-15-

LaSalle's decision to make the loan and, therefore, would not constitute a *material* breach or default under any agreement between Rooths and LaSalle. The underwriter on the Rooths loan, Patrick Miguel, testified that the difference between a 50% interest and a 100% interest in the single-family residences would have affected Rooths' net worth by $122,500, but that, at the time the Rooths loan was originated and underwritten, the MFG underwriting guidelines contained no borrower net worth requirement. (Miguel Dep. at 117-18, 126-28.) The testimony of other former MFG employees consistently confirms that, because the MFG program focused on property cash flow as the primary means of repayment of the loans, borrower net worth was not a significant underwriting consideration at the time these loans were underwritten. (*See, e.g.*, Gembara Dep. at 98-99; Rubin Dep. at 111.)

Second, there is no evidence suggesting that Rooths' alleged misrepresentation had a material and adverse affect *on the collateral property*, as required by RW-13. As noted above, RW-13 is expressly limited to breaches that "materially and adversely affect[] the value of the Mortgage Loan *and* the related Mortgaged Property." (MLPA, Ex. B, RW-13; emphasis added.) Thus, to prove a breach of RW-13, plaintiff must prove that the alleged material breach had a "material and adverse effect" not only on the value of the loan, but also on the collateral property. In this case, there is no evidence that the value of the property securing the loan at issue was affected in any way whatsoever by whether Rooths owned 50% or 100% of three entirely separate single-family residences. Mr. Owen admitted as much when he testified that the appraised value of the subject property would not have been impacted by whether Rooths owned 50% or 100% of other properties:

> Q.     Well, if an appraiser went out on the date of Mrs. Rooths' application and appraised the value of the property, would that value have changed based on whether she represented that she had a hundred percent or only fifty percent of those three single family residences that she put on her scheduled of real estate owned?
>
> * * *
>
> Q.     . . . [T]he value would have been the same either way?

A.     Right.  The appraised value would have been the same either way.

(Owen Dep. at 101.)  In addition, there is no evidence to support plaintiff's speculation (which also defies common sense) that the collateral property securing the Rooths loan would have increased in value if Rooths had owned 100% of the single-family residences she identified on the schedule.  Because plaintiff cannot offer evidence to demonstrate that Rooths' alleged misrepresentation had any material and adverse affect on the value of the collateral securing the Rooths loan, LaSalle is entitled to judgment as a matter of law on the related contract claim.

> 2.     LaSalle Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim Based On Alleged Building Code Violations (II-b)

Plaintiff alleges that the Priest property was not in compliance with city building codes at the time of the securitization, in violation of ¶6(e) of the Priest mortgage, and that, as a result, LaSalle breached RW-13.  (Compl., ¶38(a), ¶60(b)(1).)  LaSalle is entitled to judgment as a matter of law on this claim for at least two reasons.  First, the more general RW-13, by its very terms and under well settled principles of contract interpretation, has no application where, as here, a more specific representation, RW-22, is implicated.  Second, there is no evidence that LaSalle breached RW-22 given the absence of evidence that the code violations alleged by plaintiff were in existence at the closing of the securitization.

> a.     RW-13 Does Not Apply Where, As Here, Another More Specific Warranty Covers The Subject Matter

By its terms, RW-13 applies only in the absence of another, more specific warranty.  The final clause of RW-13 states that:

> this representation and warranty does not address or otherwise cover any default, breach, violation or event of acceleration that specifically pertains to any matter otherwise covered by any other representation and warranty made by the Seller.

This contractual provision is consistent with New York principles of contract construction, pursuant to which a specific provision controls over a general provision.  "Where there are general and special provisions relating to the same thing, the special provisions control, even if there is an inconsistency between the specific provisions and the general provisions.  This

rule presumably recognizes that parties are more likely to have bargained over specific terms than over general language and, thus, that specific terms are more likely to indicate the intent of the parties." *Hernandez v. Wyeth-Ayerst Laboratories*, 188 Misc.2d 254, 257, 727 N.Y.S.2d 591, 591 (N.Y. Sup. Ct. 2001); *W. Alton Jones Foundation v. Chevron U.S.A., Inc.* (In re Gulf Oil/Cities Service Tender Offer Litigation), 725 F. Supp. 712, 7301 (S.D.N.Y. 1989) ("the specific clause 'operate[s] as a modification and pro tanto nullification' of the general clause") (citations omitted).

Thus, even if there *were* facts that would constitute a breach by the borrower of RW-13, i.e., of "documents evidencing or securing the Mortgage Loan," RW-13 has no application where, as here, another more specific representation and warranty applies to the subject matter at issue. RW-22, also contained in Ex. B to the MLPA, provides as follows:

> (22)  To the Seller's *actual knowledge*, there are *no actions, suits, arbitrations or governmental investigations or proceedings by or before any court or other governmental authority* or agency *now pending against or affecting* the Mortgagor under any Mortgage Loan or *any of the Mortgaged Properties* which, if determined against such Mortgagor or such Mortgaged Property, would materially and adversely affect the value of such Mortgaged Property, the security intended to be provided with respect to the related Mortgage Loan, or the ability of such Mortgagor and/or the current use of such Mortgaged Property to generate net cash flow to pay principal, interest and other amounts due under the related Mortgage Loan; *and to the Seller's actual knowledge there are no such actions, suits or proceedings threatened against such Mortgagor.*

(Emphasis added.)

This representation squarely applies to plaintiff's allegations regarding a breach of representations and warranties based on building code violations at one of the Priest properties securing the Priest Loan. The City of Biddeford, Maine, is a "governmental authority," and the September 26, 2007, Notice of Violation declaring 8 Williams Court to be an unsafe structure and prohibiting occupancy of the building, upon which plaintiff's claim is based, is an "action ...

against or affecting ... the Mortgaged Propert[y.]" (Owen Dep. at 219, Ex. 28.)[4] LaSalle represented in RW-22 that, at the time of the securitization, it had no "actual knowledge" that any such action was pending *or threatened*. Thus, RW-22 applies and RW-13 is inapplicable.

      b.      <u>Plaintiff Has No Competent Evidence To Establish Its Claim</u>

While RW-22 applies to plaintiff's allegations that LaSalle breached a representation or warranty in connection with building code violations at 8 Williams Court, the evidence demonstrates that LaSalle did not breach RW-22. According to plaintiff, code violations existed at the time of the close of the securitization at one of the two buildings comprising the Priest property, 8 Williams Court. This claim is based on a "Notice of Violation" dated September 26, 2007 (almost eighteen months *after* the close of the securitization) from the City of Biddeford, Maine, to Priest. (Owen Dep. at 219, Ex. 28.) In the Notice, Roby Fecteau, the Biddeford Life Safety Inspector/Plumbing Inspector, listed thirty-seven alleged code violations at 8 Williams Court, including, for example, "excessive trash build-up," "front door broken and off hinges," "dumpster leaking," and "gas grills can't be used on 2nd floor and above." Mr. Fecteau, on behalf of the City of Biddeford, declared 8 Williams Court to be an unsafe structure, and prohibited occupancy of the building until the alleged violations were remedied. (*Id*.)

Plaintiff alleges, without any evidentiary support, that at least some of these alleged violations existed at the time of the securitization. (Owen Dep. at 219.) But plaintiff has not adduced any evidence, as it must to prevail, that the code violations alleged in the September 26, 2007 notice existed eighteen months earlier, at the time of the securitization. During discovery in this case, plaintiff's counsel represented that "while Capmark would have knowledge of the condition of the properties as of the time it performed its own property inspection(s), and Crown NorthCorp would have knowledge of the condition of the properties as of the time it performed its own inspection(s), neither would have specific knowledge regarding the condition of the

_____

[4] LaSalle reserves and specifically does not waive any rights to argue that Ex. 28 is inadmissible hearsay and that any determination that the conditions identified within Ex. 28 constitute code violations is not binding on LaSalle.

properties on the actual Closing Date." (Owen Dep. at 23-24; Dep. Ex. 152.) In his deposition, plaintiff's representative Roy Owen further testified that his knowledge of the condition of the properties was limited to the inspections performed well after the securitization, once Crown became the special servicer. (*Id.* at 24.) Plaintiff's admission that it has no evidence of the condition of the Priest property as of the date of the securitization is fatal to its claim that code violations existed at the time of the securitization.[5]

Further, even putting aside plaintiff's admission, there is no evidence to suggest that LaSalle had <u>actual knowledge</u>, either at the time of the underwriting and closing of the Priest Loan in September of 2005, or at the time of the securitization six months later, of even the threat of any alleged code violations. (Owen Dep. at 261.) To the contrary, the initial inspection company that inspected the Priest property at the time the loan was being underwritten indicated to LaSalle that the property appeared to be in code compliance at that time. (*See* Owen Dep. Ex. 107 at p.6.) In addition, no potential code violations were noted by the appraiser who visited and appraised the property during the underwriting. (*See* Owen Dep. Exs. 16 and 17.) Plaintiff also has not adduced evidence that LaSalle learned any facts between the time of these inspections and the closing of the securitization that would have put it on notice of the presence of any code violations.

Because there is no evidence to support a claim that LaSalle had actual knowledge that any condition at the Priest property posed a threat of a code violation citation by the City of Biddeford, plaintiff cannot establish a breach by LaSalle of a representation and warranty based on the alleged code violations. LaSalle, therefore, is entitled to judgment as a matter of law on this claim.

---

[5] Plaintiff claims that several of the alleged code violations contained in Ex. 28 are "non-transient," and "are highly unlikely to have been different between the time of the Notice of Violation in September of 2007 and the date of the origination of the loan in September of 2005." (D'Andrea Dep. Ex. 231, at p. 15.) But, this rank speculation is not probative *evidence* sufficient to avoid summary judgment. *See Arendale v. Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (conclusory statements based on mere speculation, conjecture or fantasy do not defeat summary judgment) (citation omitted).

3.    LaSalle Is Entitled to Judgment As A Matter Of Law On Plaintiff's Claim
Based On The Alleged $20,000 Second Mortgage (II-a)

Plaintiff alleges that LaSalle breached RW-6 because a second mortgage of $20,000 existed with respect to the Priest property that was not disclosed on the Mortgage Loan Schedule. RW-6 represents, in pertinent part, that "[n]o Mortgaged Property secures any mortgage loan not represented on the Mortgage Loan Schedule." For the purposes of this Motion, defendant assumes that a second mortgage of $20,000 existed at the time of the securitization and was not listed on the Mortgage Loan Schedule. It is undisputed that any such second mortgage arose after the closing of the Priest Loan, and there is no evidence that LaSalle had any knowledge of a second mortgage at the time of the close of the securitization. (D'Andrea Dep. at 181.)

Even assuming the existence of an undisclosed second mortgage of $20,000, LaSalle is entitled to judgment as a matter of law on plaintiff's claim because plaintiff cannot demonstrate any adverse effect caused by the small amount of additional debt. In order to be entitled to the repurchase remedy plaintiff seeks in this action, plaintiff must plead and prove that the alleged breach "materially and adversely affect[ed] the value of [the] Mortgage Loan, the related Mortgaged Property or the interests of the Trustee or any Certificateholder in the Mortgage Loan or the related Mortgaged Property." (PSA §2.03(b); Compl., ¶41.) In this case, plaintiff has admitted facts demonstrating the *absence* of any evidence of a material adverse effect.

Mr. Owen testified in his deposition that the existence of the second mortgage did not impede the plaintiff in its efforts to foreclose on the Priest property or otherwise affect the first lien security interest the plaintiff had in the property. (Owen Dep. at 217-18.) Moreover, while Mr. Owen *speculated* that the existence of the second mortgage may have contributed to Priest's default or prevented him from making repairs at the property, there is *no evidence* to support that speculation. (*Id*. at 218.) The note associated with the second mortgage, if one exists, is not in the record in this case, so the Court cannot tell whether payments were even *due* under the note prior to Priest's default on the Priest Loan, nor is there evidence of the *amount* of any payments that may have been due. Likewise, plaintiff has no admissible evidence of how much, if any,

Priest paid on the second mortgage.  (*Id.* at 218.)[6]  In the absence of evidence that Priest paid material amounts on the second mortgage—and that, as a result, there was a material adverse impact on plaintiff's interest—plaintiff cannot establish a necessary element of its claim, and judgment should be entered in favor of LaSalle.

> 4. <u>LaSalle Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claims Under RW-13 Based On The Borrowers' Alleged Failure To Make Repairs Called For In Repair Letters (I-b and II-c)</u>

In the course of making the loans at issue in this case, LaSalle sent to Rooths two "repair letters," identifying certain repairs to be performed within a specified time frame.  (Owen Dep. Exs. 44, 45.)  In the Second Amended Complaint, plaintiff alleges that Rooths failed to make the repairs called for under one of these two letters (Ex. 44) and that, as a result, Rooths was in breach of the "documents evidencing or securing the Mortgage Loan" on March 30, 2006 when the securitization closed, constituting a breach by LaSalle of RW-13.  (Compl., ¶34(b), ¶53(b); Owen Dep. at 141-42.)  Plaintiff also alleges that Priest failed to make repairs called for under a similar repair letter (Owen Dep. Ex. 25), thereby also causing LaSalle to breach RW-13. (Compl. at ¶38(b), ¶60(b)(2).)

LaSalle is entitled to judgment as a matter of law on these claims because, with respect to most of the listed repairs, there is no evidence to support plaintiff's assertion that the repairs were not completed by the borrowers prior to the close of the securitization on March 30, 2006, the relevant date under RW-13.  With respect to any repairs that arguably were not made, there is no evidence that any such failure to make a repair "materially and adversely affect[ed] the value of the Mortgage Loan and the related Mortgaged Property," as required by RW-13.

> a. <u>The Rooths Repair Letter Claim Fails</u>

---

[6] Although Mr. Owen testified that Priest told him he made a payment or payments in an unknown amount, any testimony by Mr. Owen as to which he was told by Priest is inadmissible hearsay and should not be considered by this Court for the purposes of this summary judgment motion.  (Owen Dep. at 215.)  Plaintiff did not depose Priest in this matter and has no admissible evidence of any payments on the second mortgage, let alone evidence of payments in any material amount.

The Rooths repair letter contained a list of the following four repair items:

1.    Asphalt parking lot needs pothole repair and new topcoat sealant and striping;

2.    Properly attach all building gutters;

3.    Repair or replace damaged exterior windows and window seals; and

4.    Remove debris surrounding complex signage.

(Ex. 44.)  In order to prove a claim under RW-13, plaintiff must prove that Rooths failed to make the repairs within the 180-day period called for in the repair letter, and that any such failure was not cured as of the time of the securitization on March 30, 2006.  Plaintiff must also prove that any repairs that remained to be made as of the date of the securitization had a material and adverse impact on the value of the loan and the mortgaged property.  (See RW-13.)

Both plaintiff's counsel and plaintiff's representative, Mr. Owen, have represented that plaintiff has no knowledge regarding the condition of the Rooths and Priest properties as of the date of the securitization.   In the absence of evidence to demonstrate the condition of the property at the time of the close of the securitization, and specifically evidence that the repairs remained unperformed as of that date, plaintiff cannot prevail.

Mr. Owen, testifying as the corporate representative for the plaintiff, conceded that, with the possible exception of the parking lot repairs noted in the repair letter, plaintiff cannot establish that any of the required repairs remained unperformed as of March 30, 2006.  Mr. Owen testified that, although he observed some needed repairs when he visited the property in April of 2007—more than one year after the close of the securitization—he had no way of knowing whether those repairs were the same repairs called for under the Rooths repair letter. He stated:

A.    [Regarding the gutter repairs --]  I have seen no evidence to -- one way or the other that these repairs were done.

Q.    You don't know if they were or were not?

A.    Or were not.

> Q. And that applies to the remaining repairs there, too, as far as the exterior windows and seals? You told me that the debris appeared at least to have been repaired?
>
> A. Yes, although I have no evidence that the debris was removed as of March 30, 2006. With respect to the damaged windows and windowsills, I observed damaged windows, windows covered with plywood; **but whether they were these windows, I do not know**.

(Owen Dep. at 151-52.) Mr. Owen's testimony is consistent with an inspection report prepared at the direction of the plaintiff's master servicer on August 31, 2006. (*Id*. at 153-155, Ex. 147.) That inspection report demonstrates that, at least as of that date, just five months after the close of the securitization, the only visible deferred maintenance item at the Rooths property was the parking lot. Mr. Owen testified that he has no evidence to suggest that, as of August 31, 2006, the date of the first inspection after the securitization, <u>any</u> repairs other than the parking lot repairs had remained undone. (*Id*. at 154-55.) Thus, the only possible repair upon which plaintiff could base a claim of breach is the parking lot repairs noted in item 1.

With respect to the parking lot repairs, plaintiff's claim also fails because there is no evidence that the condition of the parking lot had any material and adverse affect on the value of the mortgage loan and the mortgaged property. When questioned on this point in his deposition, Mr. Owen expressed his personal opinion that the parking lot diminished the "curb appeal" of the property, speculating that it could affect cash flow through making the units less rentable. (*Id*. at 156-57.) However, Mr. Owen admitted that he had no evidence that there was any *actual effect* on the ability to rent units based on the condition of the parking lot. (*Id*. at 158.) Similarly, plaintiff's expert witness, John D'Andrea, testified as follows:[7]

> Q. Did the failure to complete the repairs of the parking lot impact the occupancy level of the property?
>
> A. It's my opinion that they likely did. **I have no direct knowledge as to whether or not they did.**

---

[7]Motions in limine and to disqualify experts are due in this case on February 2, 2009. At that time, LaSalle intends to move under Federal Rule of Evidence 702, challenging the admissibility of Mr. D'Andrea's opinion. LaSalle expressly reserves its rights to do so.

Q. You don't know whether a potential tenant didn't take an apartment due to the parking lot condition, right?

A. I do not.

(D'Andrea Dep. at 289-90.)[8]

Because plaintiff cannot demonstrate an actual material and adverse effect on the loan and property resulting from the failure of Rooths to make repairs called for under the repair letter, LaSalle is entitled to judgment on this claim as a matter of law.

### b. The Priest Repair Letter Claim Fails

The repair letter sent to Priest contains similar repair items to those set forth in the letter to Rooths. It identifies the following items for repair: (1) broken windows on the back side of 8 Williams Court; (2) replace missing vinyl siding on 8 Williams Court; (3) clean Unit 103 in 8 Williams Court to eliminate any health issues; (4) replace missing vinyl trim on 15 Williams Court; (5) clean up debris on exterior of 15 Williams Court; (6) remove paint cans in the basement of 15 Williams Court; and (7) replace porch roofs on 15 Williams Court. (See Ex. 25.)

Although plaintiff admits it does not have knowledge of the condition of the Priest property as of the date of the securitization, plaintiff alleges, generally, that these repairs were not completed as of that date, and that LaSalle breached RW-13 as a result. (Compl., ¶34(b), 53(b).) This claim fails for two reasons. First, plaintiff's own inspection report, prepared shortly

---

[8] Mr. D'Andrea gave an "opinion" in his deposition, which is not found in his report, that there was an adverse impact on the value of the property of "between 8 and $10,000," based on estimates made **in 2007** of the cost to repair the parking lot in its then-current condition. (D'Andrea Dep. at 288-89, 290, Ex. 231.) This Court should disregard this opinion for two reasons. First, it is not expressed in Mr. D'Andrea's report and, therefore, is not admissible pursuant to this Court's General Order No. 1, paragraph I(B)(3). Second, Mr. D'Andrea is not competent to offer such an opinion. He is not an appraiser and has never had experience in assessing the impact of deferred parking lot maintenance on the value of property or a loan. (*Id.* at 78, 290.) There is no evidence or competent expert testimony in this case that, if parking lot repairs in the amount of $8-10,000 were made, there would be *any* increase in the overall value of the property, let alone a corresponding increase equaling the total amount of the repairs. Thus, there is no basis for Mr. D'Andrea's speculation that the repairs, if made, would have resulted in a dollar-for-dollar impact on the value of the property. In the absence of competent evidence regarding the actual impact on the value of the property, if any, from any failure to make repairs, there is no evidence from which a jury could determine that the impact was "material." Moreover, even if Mr. D'Andrea's opinion and analysis were competent on this point, and the total of the 2007 repair estimates were considered to equal an adverse impact on the property value, the alleged difference in value is about .01136 (or about 1.13%) of the appraised value of the property at the time the loan was made, hardly a magnitude that could reasonably be considered to be material.

after the close of the securitization, fails to mention any of these alleged items of deferred maintenance, and therefore constitutes an admission by plaintiff that no material repairs remained, at least as of the date of that inspection. Second, even if repairs were not completed as of the close of the securitization, plaintiff has adduced no evidence to demonstrate that any such conditions had a material and adverse effect on the mortgage loan and the mortgaged property, as required under RW-13.

The first inspection by plaintiff, through its master servicer (Capmark) after the close of the securitization, was conducted on October 6, 2006. (Owen Dep. at 163-65, Ex. 148.) This inspection report **identifies none of the items appearing on the repair letter as still in need of repair as of that date**. Plaintiff's inspector did not observe any broken windows. (*Id.*) Plaintiff's inspector did not observe any missing siding or trim. (*Id.*) While the inspector noted the presence of trash on the ground at the property, Mr. Owen admitted there is no evidence that the trash noted by the inspector was the same debris identified in the repair letter. (*Id.* at 166-67.) The inspector indicated no concern with the condition of any roofing material or the condition of the roof, and in fact assigned the roof condition a rating of "acceptable." (*Id.* at 168; Ex. 148 at p. 3.) While the inspector did not go inside the buildings during his inspection, Mr. Owen testified that plaintiff has no reason to believe that the clean-up of Unit 103 and the removal of paint cans had not taken place. (*Id.* at 166-67.) Mr. Owen also testified in his deposition that he was aware of no evidence to suggest that the October 6, 2006, inspection report contained any inaccuracy in its portrayal of the condition of the Priest property as of that date. (*Id.* at 164.)

Thus, plaintiff (through Capmark, its master servicer) visited the property and had an opportunity to assess, at least as of October 6, 2006, whether the repairs called for in the repair letter remained, and the inspection report **expresses no concern about the items identified in the repair letter**. This inspection report demonstrates that, *according to plaintiff's own inspector*, no material repairs remained to be done as of October 6, 2006.

Second, even assuming that some material repair was not performed, LaSalle still is entitled to judgment as a matter of law because there is no evidence of any material adverse effect on the loan and the property, as is necessary to prove a violation of RW-13. Plaintiff's expert, John D'Andrea, admitted he has not seen evidence to support the presence of any actual material adverse effect. Mr. D'Andrea's report contains five bullet points to support plaintiff's contention that a material adverse affect resulted from a failure to repair, none of which is supported by any evidence. (D'Andrea Dep. at 210 and Ex. 231 at p. 14.)

Mr. D'Andrea speculates that a failure to complete repairs "increased the risk of damage to the property." (*Id*. at 210-11.) Upon questioning in his deposition, he admitted that he did not know whether there was any actual damage resulting from any uncompleted repairs. (*Id*. at 212.) He also had no evidence to support his other speculative assumptions:

> Q.    You say, [second] bullet point, the delay in completing repairs will almost certainly result in a higher repair cost to complete the same items. Do you see that?
> A.    Yes.
> Q.    Do you know for a fact that the delay in completing the repairs has resulted in higher repair costs?
> A.    I do not know for certain.

(*Id*. at 213.) Mr. D'Andrea next speculates that "[t]he Trust will either have to incur the expense of making these repairs or will receive a reduced recovery on the loan by virtue of reduced sales proceeds from the subject properties based on the need to complete the repairs." (Ex. 231 at p. 14.) However, there is no evidence that the Trust incurred *any* expenses making any repairs to the property, nor is there any evidence to support the assertion that a failure by Priest to repair an item listed in the repair letter resulted in a material adverse effect on the "sales proceeds from the subject properties."

Mr. D'Andrea is equally speculative when, in citing to Ex. 28, the "Notice of Violation" dated September 26, 2007 relating to 8 Williams Court, he states that "certain of the repair items were noted as code violations by the City of Biddeford." (Ex. 231, at p. 14.) There is no

evidence to demonstrate that any of the items listed in the Notice dated September 26, 2007 are the *same* items listed in the repair letter. Moreover, even if one or more repair letter items existed as of September 26, 2007, there is no evidence that *that* item, in the absence of the other thirty-six cited conditions, would have prompted the action taken by the City of Biddeford.

Finally, D'Andrea speculates that "failure to complete these repairs had a negative impact on occupancy." (*Id.*) However, there is no evidence to support any *actual* negative impact on occupancy as a result of any repair contained in the Priest repair letter. In fact, the vacancy rate at the time of plaintiff's October 2006 inspection was zero percent. (Owen Dep. Ex. 148, at p. 2.) In the absence of some evidence that occupancy was actually impacted by the nonperformance of a repair letter item, there is no evidence of a material and adverse affect on the mortgage loan and the property.

> 5.      LaSalle Is Entitled to Judgment As A Matter Of Law On Plaintiff's Claims Based On Deficient Underwriting (I-d and II-e)

Plaintiff's claims based on RW-23 also fail. In the first instance, RW-23 does not encompass the *underwriting* practices about which plaintiff complains. LaSalle is entitled to judgment on plaintiff's claims for violations of RW-23 with respect to the Rooths Loan on the additional ground that plaintiffs failed to provide defendant with prompt notice of the claim, as required under the MLPA and PSA.

> a.      Representation and Warranty 23 Does Not Encompass Underwriting

Plaintiff premises its claims that LaSalle breached RW-23 with respect to both the Rooths Loan and the Priest Loan on allegations that the loan underwriting practices employed by LaSalle with respect to these two loans failed to meet industry standards. With respect to the Rooths Loan, plaintiff set forth these allegations in a letter it sent on August 22, 2008, stating:

> . . . LaSalle breached Representation and Warranty 23 in that the Rooths Loan was not one that would have been made using *underwriting practices* meeting customary industry standards. LaSalle either ignored or failed to appropriately consider a number of significant negative issues regarding both the borrower and the property.

> *Because the Rooths Loan is one that would not have been made if underwriting practices meeting customary industry standards had been utilized*, Crown NorthCorp hereby supplements its prior Breach notices to include this additional Breach.

(Owen Dep. Ex. 161; emphasis added.) Consistent with this Notice, the Second Amended Complaint alleges that LaSalle's underwriting of the Rooths Loan was deficient:

> [T]he borrower overstated her net worth by more than half a million dollars, an error that LaSalle failed to notice and *which carried through the entire underwriting process*. In addition, *during the underwriting process*, LaSalle was dissatisfied with the valuation for the collateral properties that had been reached by an appraiser and knew the loan could not be made to the borrower if that valuation was accepted.

(Compl., ¶54.) Thus, the plaintiff alleges through the contractually-required Notice and in the allegations of the Complaint that LaSalle's *underwriting practices* relating to the Rooths Loan were inconsistent with customary industry standards for underwriting.

The claim is similar with respect to the Priest Loan. The Second Amended Complaint alleges that, "[r]egarding the failure to follow customary industry standards *in the underwriting* of the Priest Loan, the loan would not have been made if customary origination practices had been utilized." (*Id*, ¶40.) This claim was first set out in a September 14, 2007, letter written by plaintiff's counsel. (See Fuhrer Aff., ¶3 and Ex. C thereto.) In that letter, Mr. Snyder describes plaintiff's claim as follows: "LaSalle breached Representation and Warranty 23 in that the loan was not one that would have been made using underwriting practices meeting customary industry standards."

Thus, plaintiff's claim with respect to both Priest and Rooths is that the *underwriting* practices of LaSalle fell short of industry standards. However, any claim that LaSalle breached the MLPA by employing underwriting practices that were inconsistent with customary industry standards fails as a matter of law for the simple reason that the MLPA, including RW-23, does not contain a representation and warranty concerning LaSalle's underwriting practices. RW-23 provides, in its entirety, as follows:

> The *origination, servicing and collection practices* used by the Seller or, to its knowledge, any prior holder of the related Mortgage Note with respect to such Mortgage Loan have been in all material respects legal and have met customary industry standards.

(Emphasis added.)  While constituting a representation regarding LaSalle's "origination, servicing and collection practices," RW-23 makes *no representation* concerning LaSalle's *underwriting* practices, nor does any other representation or warranty contained within the MLPA.  It is fundamental that, in the absence of a warranty relating to underwriting practices, there can be no successful breach claim premised on deficient underwriting practices.

To avoid this conclusion, plaintiff attempts to cram allegations about "underwriting" into the representation about "origination," apparently contending the two are one and the same. (*See, e.g.*, Compl. at ¶54.)  However, an application of well-settled principles of contract construction demonstrates that "underwriting" and "origination" are not synonymous, and that RW-23 does not apply where, as here, the plaintiff is alleging the *underwriting* was deficient.

In particular, plaintiffs' proposed interpretation would improperly render meaningless various provisions in the MLPA and PSA.  *See Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co.*, 94 N.Y.2d 398, 404, 727 N.E.2d 563 566-67 (2000) (standard rule of contract construction that interpretations that render certain provisions meaningless are disfavored).  It is well-settled that interpretation of an integrated agreement that renders provisions of the agreement superfluous are disfavored.  *See, e.g., Lawyers' Fund*, 94 N.Y.2d at 404 ("Bank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation."); *Fox Paper Ltd. v. Schwarzman*, 563 N.Y.S.2d 439, 441 (N.Y. App. Div. 1990) ("the proper aim of the court, which may not rewrite the contract, is to arrive at a construction which will give meaning to all of the language employed by the parties"); Restatement (Second) of Contracts § 203, at 93 (1981) ("an interpretation is strongly negated if it would render some provisions superfluous"); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)) ("Under New York law an interpretation of a contract that has 'the effect of

rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'").[9]

"[W]ell-settled rules of construction require the giving of due consideration to all parts of a contract to the end that the particular covenant involved be so construed, when possible, as to **give effect and meaning to every word** and expression contained in the agreement." *Benvenuto v. Rodriguez*, 279 A.D. 162, 164 (N.Y. App. Div. 1951). "Words are never to be rejected as meaningless if they can be made significant by any reasonable construction." *Allen v. Forsyth*, 25 N.Y.S.2d 822, 825 (N.Y. Sup. Ct. 1941), *citing Matter of Buechner*, 226 N.Y. 440, 443 (N.Y. 1919).

Here, the terms "[u]derwriting" and "origination" are not expressly defined in the MLPA. However, based on the plain language of Exhibit B it is abundantly clear that the parties to the MLPA understood "underwriting" and "origination" to refer to two separate and distinct undertakings. In a paragraph describing the meaning of the term "to the Seller's knowledge," the parties state that that term shall mean:

> that no officer, employee or agent of the Seller responsible for the **underwriting, origination or sale of the Mortgage Loans** . . . believes that a given representation or warranty is not true or inaccurate . . . .

(*See* MLPA, at B-14.) Later, the parties define the term "to the Seller's actual knowledge" to mean:

> that an officer, employee or agent of the Seller responsible for the **underwriting, origination and sale** of the Mortgage Loans does not actually know of any facts or circumstances that would cause such person to believe that such representation or warranty was inaccurate.

(*Id.*) Under the governing law of New York, pursuant to which each and every word in these

---

[9] *See also Scholastic, Inc. v. Harris*, 259 F.3d 73 (2d Cir. 2001) ("In determining whether a contract is ambiguous, a court must look at 'the entire integrated agreement,' to 'safeguard against adopting an interpretation that would render any individual provision superfluous."'); *A-1 Gen. Contracting Inc. v. River Mkt. Commodities Inc.*, 212 A.D.2d 897, 899, 622 N.Y.S.2d 378, 381 (N.Y. App. Div. 1995) ("a contract should not be interpreted in such a way as would leave one of its provisions substantially without force or effect").

provisions is to be given meaning, the only proper conclusion to be drawn is that "underwriting" and "origination" are not interchangeable concepts, but rather refer to two distinct activities. Stated differently, if the parties had intended for RW-23 to apply to LaSalle's underwriting practices, they clearly understood how to expressly do so by using the term "underwriting," just as they did in other provisions in the MLPA. The fact that the term "underwriting" does not appear in RW-23 compels the conclusion that this representation has no application to LaSalle's underwriting practices. *See also Williams Press Inc. v. New York*, 335 N.E.2d 299, 302 (N.Y. 1975) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose."); *Zodiac Enterp., Inc. v. ABC*, 81 A.D.2d 337, 340, 440 N.Y.S.2d 240, 242 (N.Y. App. 1981) ("language used in a contract must be interpreted in the context of the whole agreement); *Allendale Mutual Ins. Co. v. Excess Ins. Co.,* 992 F. Supp. 271, 274 (S.D.N.Y. 1997) ("fundamental contract law requires the parties' intent to be discerned by reading the contract as a whole, and by considering all its clauses together to determine if and to what extent one may modify, explain or limit another").[10]

Because RW-23 does not contain a representation about underwriting, LaSalle is entitled to judgment as a matter of law on plaintiff's claims based on alleged deficiencies in LaSalle's underwriting practices.

       b.   <u>Plaintiff Failed To Provide Prompt Notice Of Its RW-23 Claim With Respect To The Rooths Loan</u>

LaSalle is entitled to judgment as a matter of law on plaintiff's RW-23 claim with respect to the Rooths Loan on the additional ground that plaintiff did not provide "prompt" notice of that claim, as required under the MLPA. Section 6(g) of the MLPA provides that "[e]ach party

---

[10] The additional well-established principle of contract construction known as *inclusio unius est exclusio alterius* -- the inclusion of one is the exclusion of another – compels the same conclusion. *See, e.g.*, *Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 340 (N.Y. App. Div. 1998). Where parties to an agreement include certain items on a list, it is presumed that the omission of other items is intentional. *Id.* Thus, while RW-23 unambiguously includes among the practices represented to be consistent with industry standards the "origination, servicing and collection practices," the parties unambiguously omitted "underwriting practices" from that warranty.

hereby agrees to promptly notify the other party of any Breach of a representation or warranty." Indeed, failure to provide prompt notice of claims under an MLPA bars recovery because prompt notice is a contractual condition precedent. *See Morgan Guaranty,* 2002 WL 818082, at 4.[11] The undisputed evidence demonstrates that Plaintiff's notice to LaSalle of the claimed breach of RW-23 with respect to the underwriting of the Rooths Loan—sent nine months after commencing litigation and fifteen months after plaintiff first demanded repurchase of the Rooths Loan—was not prompt. *See Lehman Bros. Holdings, Inc. v. Laureate Realty Services, Inc.,* Case No. 1:04-cv-1432, 2007 WL 2904591, at *13, 2007 U.S. Dist. LEXIS 76940, at *33-34 (S.D. Ind. September 28, 2007); *Morgan Guaranty Trust Co. of N.Y. v. Bay View Franchise Mort. Acceptance Co.,* No. 00 Civ. 8613, 2002 WL 818082, at *10, 2002 U.S. Dist. LEXIS 7572, at *17 (S.D.N.Y. April 30, 2002); *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994) (in sending a first demand, plaintiff has an obligation to "pick up the scent and nose to the source").

Specifically, Plaintiff's notice to LaSalle of an alleged breach of RW-23 with respect to the Rooths Loan is dated August 22, 2008. (Owen Dep., Ex. 161.) As described in the Second Amended Complaint, this claim is based on the following "negative issues regarding both the borrower and the property": a borrower FICO score of 610; $76,000 in revolving debt; "little or no experience managing multi-family properties"; a property classification of "D"; and mathematical errors in calculating the borrower's net worth. (Compl., ¶35.) Plaintiff also

---

[11] The failure to give notice in similar situations has been interpreted by other courts in different manners, but all courts have held there are consequences to the failure to give prompt notice. One court, for instance, has held prompt notice to be an implied element of the plaintiff's cause of action. *See, LaSalle Bank Nat. Ass'n ex. rel Lewnnar Partners, Inc. v. Capco American Securitization Corp.,* Case No. 02 Cv. 9916, 2005 WL 3046292, at *2, 2005 U.S. Dist. LEXIS 27781, at *7 (S.D.N.Y. 2005). Other courts have held the lack of prompt notice is an offset to damages. *See Trust for Certificate Holders of Merrill Lynch Mort. Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.,* Case No. 04 Civ. 9890, 2005 WL 2582177, at *7, 2005 U.S. Dist. LEXIS, at *32 (S.D.N.Y. 2005); *LaSalle Bank Nat. Ass'n. v. Nomura Asset Capital Corp.,* 846 N.Y.S.2d 95, 47 A.D. 3d 103 (N.Y. App. Div. 1st Dept. 2007). The better interpretation is that prompt notice is a condition precedent to plaintiff's ability to invoke the Section 2.03(b) remedies contained in the PSA because the MLPA mandates that such notice be provided.

alleges LaSalle requested that the appraiser "re-do" the appraisal without new data or documentation, in alleged violation of LaSalle's internal procedures. (*Id.*)

The evidence is undisputed, however, that all of the foregoing information was available to and reviewed by plaintiff prior to May 22, 2007, when plaintiff first demanded repurchase of the Rooths Loan, because this information is derived from the Rooths loan file which formed the basis for the May 22, 2007 notice. (See Fuhrer Aff., ¶3 and Ex. B thereto.) The underwriting submission contained in the loan file sets forth the borrower's FICO score, the property classification, the management experience of borrower, the borrower's net worth and the borrower's revolving debt. (Miguel Dep., Ex. 33.) Loan file documents also give all the necessary information to determine whether the borrower's net worth was miscalculated. Although defendant disagrees with plaintiff's characterization of the circumstances surrounding the revised appraisal, certainly both the original and revised appraisals, as well as the original and revised appraisal reviews, were in the file and available to plaintiff for review. (Fuhrer Aff., ¶4.)

Because notice of plaintiff's claim under RW-23 relating to the Rooths Loan cannot be considered "prompt" by any measure, it is barred as a matter of law.

B.    Defendant Is Entitled To Summary Judgment On Counts III And IV Of Plaintiff's Complaint

In Counts III and IV of the Complaint, plaintiff asserts claims of fraud and negligent misrepresentation based on a single statement contained in an Asset Summary Report for the Priest Loan: "All HVAC's," which refers to heating, ventilation and air conditioning systems, "will be inspected by a licensed party. A hold back will be required." Plaintiff contends that this statement is misleading because the HVAC inspection requirement had been waived prior to the closing of the Priest Loan and LaSalle failed to disclose this fact. Plaintiff further contends that this alleged misstatement deceived Forum, which, as the purchaser of the lowest rated and thus riskiest Certificates, had the ability to conduct due diligence on the loans securitized by LaSalle

and reject the loans proposed by LaSalle for securitization. According to plaintiff, Forum would have rejected the Rooths loan had it known that the HVAC inspection condition was waived.

"Under New York law, the plaintiff bears the burden of proving each element of a fraud claim by clear and convincing evidence, and not a mere preponderance. This evidentiary standard demands a higher order of proof . . . and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *PPI Enters. (U.S.) v. Del Monte Food Co.*, No. 99 Civ. 3794, 2003 WL 22118977, at *19 (S.D.N.Y. Sept. 11, 2003) (citations omitted).[12]

To satisfy this burden, plaintiff must establish by clear and convincing evidence: (1) a false representation or omission of a material fact, (2) justifiable reliance by the plaintiff on that representation, (3) the representation was *intentionally made* to induce the plaintiff to rely, and (4) an actual injury as a result of such reliance. *See Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y. 2d 413, 421 (N.Y. 1996). Detrimental reliance is also an element of a claim of negligent misrepresentation. *See, e.g., Meyercord v. Curry*, 832 N.Y.S.2d 29, 30 (N.Y. App. Div. 2007). In addition, to prevail on a claim for negligent misrepresentation a plaintiff has the burden to prove the existence of "a special relationship of trust or confidence." *H&R Project Assocs., Inc. v. City of Syracuse*, 737 N.Y.S.2d 712, 713 (N.Y. App. Div. 2001).

As discussed below, LaSalle is entitled to judgment as a matter of law because: (i) with respect to plaintiff's fraud claim, there is no evidence that LaSalle acted with the requisite intent to deceive Forum; (ii) plaintiff cannot demonstrate the actual or justifiable reliance necessary to succeed on its fraud and misrepresentation claims; and (iii) there was no fiduciary or confidential

---

[12]  Both the PSA and MLPA select New York law as applicable to the "obligations, rights and remedies of the parties." PSA, §11.04; MLPA, §11. New York law also applies to the tort claims. "It is well-settled that, in diversity cases, federal courts look to the laws of the forum state to resolve issues regarding conflicts of law." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Federal courts within the Sixth Circuit are likely to apply the state law chosen by the contracting parties to related tort claims where, as here, the contractual choice of law provision is sufficiently broad. *See Proctor & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270, 1288-89 (S.D. Ohio 1996) (applying New York law where the contract provided for New York law "without reference to choice of law doctrine"); *Ranco Mgmt. Corp. v. DG Inv. Bank Ltd.*, 17 F.3d 883, 886 n.2 (6th Cir. 1994) (applying New York law to negligent misrepresentation claim where contract provided for New York law).

relationship between the parties such that LaSalle had a duty, or could be liable for negligent misrepresentation, to plaintiff or Forum.

1.  There Is No Evidence Of Intent Sufficient To Prove Plaintiff's Fraud Claim

To prove its fraud claim, plaintiff must demonstrate that LaSalle had an intent to deceive plaintiff, Forum or other Certificateholders regarding whether an HVAC inspection would be conducted or a holdback required.  *See New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 319, 662 N.E.2d 763 (N.Y. 1995) (dismissing fraud claim where there is no inference of fraudulent intent); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec. LLC*, -- F. Supp. 2d --, No. 05 Civ. 9016, 2009 WL 29649, **8-9, 16 (S.D.N.Y. Jan. 5, 2009) (granting summary judgment on common law fraud claims where plaintiffs failed to show scienter; stating that even if defendant hedge fund administrators had a duty to verify the value of securities, "failure to do so - in the absence of further evidence of deceit - would amount to negligence, not recklessness"); *see also Stuart Silver Assocs. v. Basco Dev. Corp.*, 665 N.Y.S.2d 415, 418 (N.Y. App. Div. 1997) (summary judgment should have been granted as to fraud claim where plaintiffs presented no evidence that offering materials were intentionally falsified); *Kamhi v. Tay*, 664 N.Y.S.2d 288, 289 (N.Y. App. Div. 1997) (fraud claim properly dismissed because there no facts from which scienter may be inferred); *Berner v. Moore Bus. Forms*, 613 N.Y.S.2d 307, 308-09 (N.Y. App. Div. 1994) (summary judgment granted where plaintiff failed to raise a triable issue of fact with respect to the scienter element of fraud); *Zaref v. Berk & Michaels, P.C.*, 595 N.Y.S.2d 772, 774-75 (N.Y. App. 1993) (fraud claim should have been dismissed where there is no claim that defendants intended to defraud plaintiffs by advising them to make certain investment, merely that they were careless and inattentive).

In this case, there is not a shred of evidence that LaSalle acted at any time with an intent to deceive.  This total lack of evidence is in stark contrast to Plaintiff's burden of coming forward with clear and convincing proof of each element of the claim.  Moreover, there is *no*

evidence that LaSalle concealed the waiver of the condition from Certificateholders. To the contrary, the Priest Loan Mortgage file, to which plaintiff and Forum had access and they reviewed, contained a loan approval letter in which Mr. Gembara, the underwriter of the Priest Loan, noted next to item 15 regarding the HVAC inspection requirement, "Per NFR, in good condition." Mr. Gembara testified that this notation indicates that he had waived or cleared the condition. (Gembara Dep. at 250-51, Ex. 92.) Obviously, LaSalle could not have acted with an intent to deceive where it disclosed in the loan file that was reviewed by investors that the HVAC inspection and holdback condition had been waived. LaSalle likewise had no motive to lie because there is no evidence that LaSalle had a reason to believe that waiver of this condition would have affected Forum's decision whether to keep the Priest loan in the pool. Nor is there evidence that keeping this one loan in the pool (from among approximately five hundred (500) that were in the MF2 securitization) was significant to LaSalle such that it had an incentive to or did intentionally mislead Forum or plaintiff. In short, the evidentiary record here is devoid of a single document or any deposition testimony directly or even inferentially supporting a conclusion that LaSalle acted with the necessary fraudulent intent in connection with the HVAC inspection and holdback.

In light of the foregoing, it is clear that plaintiff impermissibly is attempting to "transmogrify [a] contract claim into one for tort," and thereby also threaten LaSalle with a claim for punitive damages, which is not available on a contract theory of recovery. *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401-03 (S.D.N.Y. 2004). Certainly, plaintiff could have attempted to assert a contract claim based on the HVAC inspection and holdback condition under Section 6 of the MLPA, which provides:

> (a) The Seller represents and warrants to the Purchaser as of the Closing Date that: . . . (viii) it has no actual knowledge that any statement, report, officer's certificate or other document prepared and furnished or to be furnished by the Seller in connection with the transactions contemplated hereby (including, without limitation, any financial cash flows and underwriting file abstracts furnished by the Seller) contains any untrue statement of a material fact or omits

> to state a material fact necessary in order to make the statement contained therein, in light of the circumstances under which they were made, not misleading.

Rather than asserting a breach of contract based on the above representation in connection with the HVAC inspection issue, plaintiff chose instead to improperly assert tort claims based on Defendant's contractual obligations. "It is well-established in New York that where a fraud claim is 'premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action in fraud does not lie.'" *LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*, No. 01 Civ. 4389, 2002 WL 31729632, *12 (S.D.N.Y. Dec. 5, 2002) (citations omitted) (dismissing fraud and negligent misrepresentation claims where the tort claims stem directly from the breach of representations and warranties).

Because there is no evidence that LaSalle had an intent to deceive anyone, including plaintiff and Forum, in connection with its waiver of an HVAC inspection and holdback, LaSalle is entitled to judgment as a matter of law on plaintiff's fraud claim and it should be dismissed.

  2. <u>Plaintiff Cannot Demonstrate Actual Reliance As Required To Prevail On Its Fraud And Negligent Misrepresentation Claims</u>

LaSalle is entitled to judgment as a matter of law on plaintiff's fraud and negligent misrepresentation claims because plaintiff cannot establish that it *actually relied* on the alleged misrepresentation to its detriment. *See King v. Crossland Sav. Bank*, 111 F.3d 251, 258 (2d Cir. 1997) (granting summary judgment where plaintiff did not actually rely on the alleged misrepresentation); *Korea Life Ins.*, 269 F. Supp. 2d 424, 437 (S.D.N.Y. 2003) (granting summary judgment on fraud and negligent misrepresentation claim where plaintiffs did not rely on the alleged misrepresentation in deciding whether to enter into transaction); *Oppenheimer-Palmieri Fund, L.P, v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.)*, 802 F. Supp. 804, 811-12 (E.D.N.Y. 1992) (dismissing fraud and negligent misrepresentation claim where there was no proof of actual reliance); *K. Capolino Constr. Corp. v. White Plains Hous. Auth.*,

655 N.Y.S.2d 622, 623 (N.Y. App. Div. 1997) (negligent misrepresentation claim dismissed where there was no evidence plaintiff relied on the alleged misrepresentation).

Here, there is absolutely no evidence that any investor actually relied on the statement in the Asset Summary regarding the HVAC inspection requirement in determining whether to include the Priest Loan in the Trust or purchase MF2 Certificates.  Indeed, Mr. Hawkins stated in his deposition that he did not recall whether he reviewed the Priest Loan Asset Summary Report:

> Q.  If an asset summary report or ASR made a statement, if there was representation about the loan that was included in the ASR, did you feel it was your obligation to review the underlined loan file to confirm whether or not that representation was accurate, was that something that you did as part of your due diligence?
>
> A.  I mean, yeah, we would do that . . . Not on every loan.
>
> Q.  Let me go back to this particular asset summary report and as you sit here today, do you have an independent recollection of which specific summary reports you reviewed as part of the MF2 securitization?
>
> A.  Absolutely not.

(Hawkins Dep. at 37, 88-89.)  Mr. Hawkins further testified that he does not know whether Forum communicated with LaSalle about whether an HVAC inspection took place and does not know what Forum knew or believed at the time about whether an HVAC inspection had taken place.  (*Id*. at 212-14.)

Because there is no evidence that any investor actually relied on the statement in the ASR upon which plaintiff's claims are based, LaSalle is entitled to judgment on plaintiff's fraud and negligent misrepresentation claims as a matter of law.

3. <u>Reliance On The Asset Summary Report Would Not Have Been Reasonable Or Justifiable</u>

Additionally, even if plaintiff could demonstrate actual reliance on the statement in the Asset Summary regarding the HVAC inspection, which it cannot, any such reliance would not be reasonable or justifiable, as required to prove fraud or negligent misrepresentation under prevailing New York law.  "[Where the plaintiff has the means] of knowing, by the exercise of ordinary intelligence, the truth . . . of the subject of the representation, he must make use of those

means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Schumaker v. Mather*, 133 N.Y. 590, 596 (N.Y. 1892); *Giannacopoulos v. Credit Suisse*, 37 F. Supp. 2d 626, 632-33 (S.D.N.Y. 1999) ("[p]arties cannot demand judicial protection when they could have protected themselves with a reasonable inquiry into any misrepresented facts"); *Rudnick v. Glendale Sys. Inc.*, 635 N.Y.S.2d 657, 658 (N.Y. App. Div. 1995) (buyer can not be heard to complain they were induced into contract by misrepresentation when they had the means to learn the facts underlying the alleged misrepresentations and nondisclosures).

Sophisticated business entities are held to an even higher standard under New York law. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir. 1984).[13] "Under New York law, a Plaintiff will be deemed to have been 'practically faced with the facts' if he has access to the critical information." *Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 419 (S.D.N.Y. 1992) (*citing Grumman Allied Indus., Inc. v. Rohr Indus.*, 748 F.2d 729, 737 (2d Cir. 1984)).

Additionally, there is no justifiable reliance when a plaintiff could have discovered the truth simply by asking for the information, but did not. *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 157 (2d Cir. 1995) (no reasonable reliance where the non-disclosed information was "readily accessible to any party who cared to ask");

---

[13] *See also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001) ("In evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration"); *Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11, 14 (N.Y. App. Div. 1996) ("[p]laintiffs, who are all sophisticated businessmen, had a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they were assuming"); *Orlando v. Kukielka*, 836 N.Y.S.2d 252, 254-55 (N.Y. App. Div. 2007) (reliance by sophisticated business men on misrepresentation unreasonable as a matter of law where they conducted own audit but relied on representation).

*Compania Sud-Americana,* 785 F. Supp. at 419 (no justifiable reliance where there is no dispute had plaintiff "made simple inquiries," it would have discovered the facts); *Belin v. Weissler*, No. 97 Civ. 8787, 1998 WL 391114, at *5 (S.D.N.Y. July 14, 1998) (the alleged misrepresentation was readily ascertainable had plaintiff asked to see the insurance policy upon prior to closing on the investment); *Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 624 (S.D.N.Y. 2001) (no justifiable reliance where plaintiff had the opportunity to ask questions and receive answers from the Company concerning the transactions and to obtain further information necessary to make an informed decision regarding investment in the company but failed to do so); *Evans v. Israeloff, Trattner & Co.*, 617 N.Y.S.2d 899, 900 (N.Y. App. Div. 1994) (no reasonable reliance where plaintiff never requested to see documents underlying the compilations made by defendant accounting firm).

Here, Mr. Hawkins admitted in his deposition that he had an obligation to review the documents underlying the ASR to confirm whether the statements made therein were accurate and "dig deeper into the loans" if there were questions about any loans. (Hawkins Dep. at 38.) The Priest Loan Mortgage file, to which the Plaintiff had access and reviewed, contained both the ASR and a loan approval letter in which Mr. Gembara, the underwriter of the Priest Loan, noted next to item 15 regarding the HVAC inspection requirement, "Per NFR, in good condition." As noted above, Mr. Gembara testified that this notation indicates that he had waived or cleared the condition. (Gembara Dep. at 250-51, Ex. 92.) Thus, there is no dispute that plaintiff had access to documentation of the waiver, and had access to LaSalle for any and all questions it might have had about whether the inspection actually took place and what the results might have been. It follows, then, that plaintiff's alleged reliance on the ASR was neither reasonable nor justified as a matter of law.

4.     There Is No Fiduciary Or Special Relationship Between LaSalle And Forum

To prevail on a negligent misrepresentation claim, the plaintiff must establish the existence of a special relationship giving rise to the duty to give correct information.  *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 188-89 (2nd Cir. 2004) (negligent misrepresentation claim dismissed where complaint failed to plead a special relationship or that defendant held a unique or special expertise); *Congress Fin. Corp. v. John Morrell & Co.*, 790 F. Supp. 459, 474 (S.D.N.Y. 1992) ("New York courts do not recognize a cause of action for negligent misrepresentation in the absence of a special relationship); *PPI Enters.*, 2003 WL 22118977, at *25-26 ("In order to recover on a theory of negligent misrepresentation, a plaintiff must establish that because of some special relationship with the defendant which generally implies a closer duty of trust than the ordinary buyer-seller relationship, the law imposes on that defendant a duty to use reasonable care to impart correct information, and that the plaintiff *reasonably* relied upon the information given); *JP Morgan Chase Bank*, 350 F. Supp. 2d at 400-01 ("Under New York law, in order to state a claim for negligent misrepresentation, a plaintiff is required to allege that the speaker is bound to the other party 'by some relation or duty of care').[14]

The New York Court of Appeals enunciated the factors to be weighed in determining the existence of special duty. "a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust and confidence existed between the parties; and whether the speaker was

---

[14]  It is also "well settled that in order to allege a fraud based on a failure to disclose or omission, the plaintiff must allege a confidential or fiduciary relationship giving rise to a duty to speak."  *Martian Ent., LLC v. Harris*, 824 N.Y.S.2d 769 (N.Y. Sup. Ct. 2006); *see also Goldstein v. CIBC World Mkts. Corp.*, 776 N.Y.S. 2d 12, 14 (N.Y. App. Div.  2004) (dismissing fraud claim where plaintiff failed to allege any fiduciary relationship from which a duty to speak would arise); *Mobil Oil Corp. v. Joshi*, 609 N.Y.S.2d 214, 215 (N.Y. App. Div. 1994) (mere silence cannot constitute actionable fraud in the absence of a "confidential or fiduciary relationship between [the parties] imposing a duty to disclose"); *SNS Bank, N.V. v. Citibank, N.A.*, 777 N.Y.S.2d 62, 66 (N.Y. App. Div. 2004) ("an omission does not constitute fraud unless there is a fiduciary relationship between the parties").

aware of the use to which the information would be put and supplied it for that purpose." *See Kimmell v. Schaefer*, 89 N.Y.2d at 264-65 (1996). However, where, as here, "the duty arises in commercial contexts in which a contract exists, the duty attendant to that special relationship 'must spring from circumstances extraneous to, and not constituting elements of the contract, although it may be connected with and dependent upon the contract.'" *JP Morgan Chase*, 350 F. Supp.2d at 401.[15]

In the case, as here, of arm's length negotiations or transactions between sophisticated institutions, courts repeatedly have refused to find a fiduciary or special relationship in the absence of any relationship between the parties other than on the contract itself. *See Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539, 2004 WL 1444868, at **1,8 (S.D.N.Y. June 25, 2004) (no fiduciary relationship between noteholder in a pool of high yield bonds and issuer); *Sears v. First Pioneer Farm Credit*, 850 N.Y.S 2d 219, 223-24 (N.Y. App. Div. 2007) (a fiduciary relationship does not exist in arms-length relationships between debtors and creditors); *SNS Bank, N.V. v. Citibank, N.A.*, 777 N.Y.S.2d 62, 66 (N.Y. App. div. 2004) (no fiduciary duty where the parties merely had an arm's length relationship). Conclusory allegations are insufficient to establish a fiduciary relationship between parties to an arms-length commercial contract; plaintiff must show facts to establish that the "dealings between the parties were not arms length." *Greenberg v. Chrust*, 198 F. Supp. 2d 578, 585 (S.D.N.Y. 2002) (*citing ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 434 (S.D.N.Y. 1998) (holding that a

---

[15] Moreover, "Kimmell [does] not represent a departure from the traditional understanding that a special relationship is required in order to state a claim for negligent misrepresentation.. . . nor loosened the requirement that such a relationship must arise due to some factor extraneous to the contract's claims. *JP Morgan Chase*, 350 F. Supp.2d at 401-02 (rejecting plaintiff's argument based on Kimmell that defendants were aware of the use of the statements at issue and that the plaintiff would rely on them because they were not distinct from the defendant's obligations under the credit agreement).

conventional business relationship does not become fiduciary merely by allegation)).[16]

The parties here were in an arms-length business relationship: that of investor and seller. There is no dispute that Forum is a sophisticated business entity that was owned and managed by sophisticated business people. It is a private equity investment boutique that invested in, among other securities, commercial mortgage backed securities ("CMBS"), such as the securities at issue in this case. (Hawkins Dep. at 13-14.) Geoffrey Hawkins, who participated in the due diligence conducted by Forum, was a sophisticated and experienced businessman who has been working in the CMBS industry since the early 1990's. (*Id.* at 9-13.) Forum negotiated to conduct due diligence on the loans that LaSalle proposed to be part of the MF2 Trust and determined which loans to reject from the Trust. (*Id.* at 15-16.) Defendant's duty to disclose information underlying the Priest Loan arises solely out of the contractual relationship as set forth in the PSA and the MLPA, which the parties negotiated at arms-length. There is absolutely no evidence of any extra-contractual relationship between the parties that would rise to the level of a fiduciary or special relationship.

### C. Plaintiff's Claims For Specific Performance Fail

In paragraph (a) of its prayer for relief, plaintiff seeks the remedy of specific performance. (Compl., p. 23.) Specifically, plaintiff asks the court to enter judgment "[e]nforcing the MLPA and PSA by requiring LaSalle to repurchase the Rooths Loan and the Priest Loan from the Trust as specified in PSA §2.03(b) and MLPA §6(e) at the Repurchase

---

[16] *See also PPI Enters.*, 2003 WL 22118977, at *26 (negligent misrepresentation claim dismissed where the contract itself is the sole basis for the imposition of a special duty to disclose information); *JP Morgan Chase Bank*, 350 F. Supp. 2d at 401-03 (if not for the existence of the contract, they would have had no relationship to the Banks whatsoever; in such a case, "Plaintiff[s] may not transmogrify the contract claim into one for tort") (citation omitted); *LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868, 2003 WL 1461483, at *3-6 (S.D.N.Y. Mar. 21, 2003) (holding that no special relationship existed between a mortgage loan seller and purchaser where duty to provide accurate information about financial status of companies subject to mortgage arose solely from the operative purchase agreement); *Congress Fin.*, 790 F. Supp. at 475 (dismissing negligent misrepresentation claim where there was no special relationship with a closer degree of trust and confidence than the ordinary contractual one outside of the financing agreement); *FSP, Inc. v. Societe Generale*, No. 02CV4786, 2005 WL 475986, at *13 (S.D.N.Y. Feb. 28, 2005) (no special relationship between sophisticated parties to an acquisition agreement).

Price."  This requested remedy fails because plaintiff has an adequate remedy at law in the form of money damages.

"Under New York law, a plaintiff seeking specific performance must make an initial showing that (1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law."  *FJE Corp. v. Northville Inds. Corp.*, 198 F. Supp. 2d 249, 270 (E.D.N.Y. 2002) (*citing U.S. Fidelity and Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 921 (E.D.N.Y. 1999) and *Hadcock Motors, Inc. v. Metzger*, 459 N.Y.S. 2d 634, 636-37 (4th dep't 1983).  Where money damages are adequate to compensate plaintiff for an alleged breach of contract, the extraordinary remedy of specific performance is not available.  *Lucente v. Int'l Business Machines Corp.*, 310 F.3d 243, 262 (2nd Cir. 2002).

Even assuming a breach of a representation and warranty were established in this case, plaintiff has an adequate remedy in the form of money damages with respect to both the Rooths Loan and the Priest Loan.  Accordingly, plaintiff's claims for specific performance should be dismissed.

## IV.    CONCLUSION

For all the foregoing reasons, defendant respectfully requests that this Court enter summary judgment in its favor on all claims contained in plaintiff's Second Amended Complaint.

                                        Respectfully submitted,

Gregory A. Markel                       /s/ Loriann E. Fuhrer
Jason M. Halper                         Loriann E. Fuhrer (0068037)
Cadwalader, Wickersham & Taft LLP       Stephanie P. Union (0071092)
One World Financial Center              Kegler Brown Hill & Ritter
New York, NY 10281                      65 East State Street, Ste. 1800
Tel:  (212) 504-6000 / Fax: (212) 504-6666   Columbus, Ohio 43215-4294
greg.markel@cwt.com                     Tel: (614) 462-5400 / Fax: (614) 464-2634
jason.halper@cwt.com                    lfuhrer@keglerbrown.com
*Attorneys for Defendant*               sunion@keglerbrown.com

**CERTIFICATE OF SERVICE**

I certify that true copies of the foregoing document were served on counsel of record on January 22, 2009 in accordance with the Court's electronic filing system:

Dianne Frances Marx, Esq.
Sebaly, Shillito & Dyer
1900 Kettering Tower
40 North Main Street
Dayton, Ohio 45402
E-mail: dmarx@ssdlaw.com

Paul D. Snyder, Esq.
Snyder Law Firm LLC
11551 Granada, Suite 100
Leawood, Kansas 66211
E-mail: psnyder@snyderlawfirmllc.com

/s/ Loriann E. Fuhrer
Loriann E. Fuhrer

# INDEX TO ATTACHMENTS TO LASALLE MOTION FOR SUMMARY JUDGMENT

| ATT # | DESCRIPTION |
|-------|-------------|
| 1 | Excerpts from the deposition of Roy H. Owen, Volume 1, taken November 11, 2008 |
| 2 | Excerpts from the deposition of Roy H. Owen, Volume 2, taken November 12, 2008 |
| 3 | Excerpts from the deposition of Paul Gembara taken August 28, 2008 |
| 4 | Excerpts from the deposition of Patricia Rubin taken September 23, 2008 |
| 5 | Excerpts from the deposition of John D'Andrea taken January 7, 2009 |
| 6 | Excerpts from the deposition of Patrick Miguel taken August 26, 2008 |
| 7 | Exhibit 12 (Owen Dep.) - 05/27/2005 Multifamily Finance Group Income and Expense Statement |
| 8 | Exhibit 16 (Owen Dep.) - 08/03/2005 Completed Appraisal in a Summary Report Apartment Property - 8 Williams Court, Biddeford, ME 04005 |
| 9 | Exhibit 17 (Owen Dep.) - 08/03/2005 Complete Appraisal in a Summary Report Apartment Property - 15 Williams Court, Biddeford, ME 04005 |
| 10 | Exhibit 25 (Owen Dep.) - 09/2005 Repair Letter re: Priest loan |
| 11 | Exhibit 27 (Owen Dep.) - 09/30/2005 Mortgage Deed by Ryan Priest for 8 and 15 Williams Court |
| 12 | Exhibit 28 (Owen Dep.) - 09/26/2007 Notice of Violation to Priest from City of Biddeford, ME |
| 13 | Exhibit 30 (Owen Dep.) - Schedule of Real Estate Owned for Borrower Bonita Rooths |
| 14 | Exhibit 33 (Miguel Dep.) - 08/16/2005 LaSalle Bank Multifamily Finance Group Loan Underwriting Submission |
| 15 | Exhibit 35 (Miguel Dep.) - 04/25/2005 Multifamily Finance Group Multifamily Rent Roll for Borrower Bonita Rooths |
| 16 | Exhibit 44 (Owen Dep.) - 09/08/2005 Repair Letter re: Rooths (1) |
| 17 | Exhibit 45 (Owen Dep.) - 09/08/2005 Repair Letter re: Rooths (2) |
| 18 | Exhibit 59 (Abshier Dep.) - 03/30/2006 Mortgage Loan Purchase Agreement (MLPA) |
| 19 | Exhibit 92 (Owen Dep.) - 09/07/2005 Letter to Ryan Priest from Paul Gembara re: Loan #8688796 Priest, 815 Williams Court, Biddeford, ME 04005 |
| 20 | Exhibit 107 (Torenli Dep.) - 08/08/2005 Property Inspection and Evaluation Report, Form 4257 - Priest |
| 21 | Exhibit 147 (Owen Dep.) - 08/31/2006 Multifamily Inspection Form for Rooths Property |

| ATT # | DESCRIPTION |
|---|---|
| 22 | Exhibit 148 (Owen Dep.) - 10/06/2006 Multifamily Inspection Form for Priest Property |
| 23 | Exhibit 152 (Owen Dep.) - 10/13/2008 letter from Paul Snyder to Loriann E. Fuhrer |
| 24 | Exhibit 160 (Owen Dep.) - 05/15/2007 E-mail from Steve Brown to Roy Owen regarding Loan approval letter - Rooths |
| 25 | Exhibit 161 (Owen Dep.) - 08/22/2008 Letter from Crown Northcorp to parties re: Rooths and Priest loans |
| 26 | Exhibit 231 (D'Andrea Dep.) - 11/18/2008 Report of John D'Andrea |
| 27 | Affidavit of Loriann E. Fuhrer |
| 28 | Affidavit Exhibit A - Pooling and Servicing Agreement, dated as of March 30, 2006 |
| 29 | Affidavit Exhibit B - Letter dated May 22, 2007 |
| 30 | Affidavit Exhibit C - Letter dated September 14, 2007 |
| 31 | Affidavit Exhibit D - Final Confidential Offering Memorandum dated March 23, 2006 |