# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

WELLS FARGO BANK, N.A., etc.,

      Plaintiff,              :       Case No. 3:07-cv-449


     -vs-                          Magistrate Judge Michael R. Merz
                                :

LaSALLE BANK NATIONAL
ASSOCIATION,

      Defendant.

---

## DECISION AND ORDER ON SUMMARY JUDGMENT MOTIONS

---

This case is before the Court on Wells Fargo's Motion for Partial Summary Judgment (Doc. No. 110) and LaSalle's Motion for Summary Judgment (Doc. No. 111), both of which were filed on the deadline for motions of this character and after the discovery cut-off.

The parties unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) in their Fed. R. Civ. P. 26(f) Report (Doc. No. 14) and the case has been referred on that basis (Doc. No. 15).

Although both parties have moved for summary judgment, these are not true cross-motions. See Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d §2720 (1998), on the situation where parties make cross-motions for summary judgment, but do not concede the facts are truly undisputed from the opposing party's perspective as well as their own.

# SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal*

*Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

**Applicable Law**

This Court has subject matter jurisdiction of this case under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Complaint, Doc. No. 1, ¶ 15.) The Court's subject matter jurisdiction is not contested.

State substantive law governs the case. 28 U.S.C. §1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). In a diversity action, the district court is obliged to apply the choice of law rules of the State in which it sits. *Klaxon v. Stentor Electric Mfg. Co*., 313 U.S. 487, 491, 61 S. Ct. 1020, 85 L. Ed. 2d 1477 (1941); *Boyd v. LaMaster,* 927 F.2d 237 (6th Cir. 1991); *Macurdy v. Sikov & Love, P.A.,* 894 F.2d 818 (6th Cir. 1990). Ohio recognizes the validity of contractual choice of law clauses. *Crystal Clear Imaging, Ltd., v. Siemens Medical Solutions, Inc.*, 2008 WL 2114867 at *4 (S.D. Ohio May 19, 2008), citing *Boyle v. Jacor Communications, Inc*., 799 F. Supp. 811, 813 (S.D. Ohio 1982), citing *Nationwide Mut. Ins. Co. v. Ferrin,* 21 Ohio St. 3d 43, 487 N.E. 2d 568 (1986).

Section 11 of the Mortgage Loan Purchase Agreement (the "MLPA") provides:

> **Governing Law.** This Agreement shall be construed in accordance with the laws of the State of New York without regard to conflicts of laws principles and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 11.04 of the Pooling and Service Agreement (the "PSA") provides:

> **Governing Law.** This Agreement and the Certificates shall be construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed in said State, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Therefore New York law governs the contractual issues in this case as the parties agree. Under New York law, Wells Fargo bears the burden of proving its breach of contract claim by a preponderance of the evidence. *Enercomp, Inc. v. McCorhill Pub., Inc.,* 873 F.2d 536, 542 (2nd Cir. 1989); *Weschler v. Hunt Health Systems, Ltd.,* 330 F.Supp.2d 383, 403 (S.D.N.Y. 2004).

A contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed. *Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 548 (1995), *aff'g, Wallace v. 600 Partners Co.,* 618 N.Y.S.2d 298 (1st Dep't. 1994)(citation omitted). When the meaning of a contract is plain and clear, it is entitled to be enforced according to its terms. *Uribe v. Merchants Bank of New York,* 91 N.Y.2d 336, 340 (1998)(citation omitted). In other words, it is incumbent on the court, when interpreting a contract, to give the words and phrases contained therein their ordinary, plain meaning. *Wallace,* 618 N.Y.S.2d at 302.

Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face. *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)(citations omitted). In other words, evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. *R/S Associates v. New York Job Development Auth.,* 98 N.Y.2d 29, 32 (2002), *citing, W.W.W. Associates, supra.* The rule has even greater force where commercial certainty is a paramount concern and the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length. *Wallace,* 86 N.Y.2d at 548(citation omitted).

> [A warranty is]
> an assurance by one party to a contract of the existence of a

fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

*Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.). This definition has since been adopted for the most part by the New York Court of Appeals, which views "express warranties as bargained-for contractual terms." *CBS Inc. v. Ziff-Davis Publ'g Co.,* 75 N.Y.2d 496, 553 N.E.2d 997, 1001, 554 N.Y.S.2d 449 (N.Y. 1990). Consequently, [o]nce the express warranty is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached. *Id*. at 1000; see also *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 229 (S.D.N.Y. 2005) (following *Ziff-Davis* to support the proposition that, under New York law, "it is not reliance on the truth of the warranted information but reliance only on the existence of the warranty as part of the sales contract that is necessary to establish a breach of express warranty claim").

*LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc*., 2007 U.S. Dist. LEXIS 59303 (S.D.N.Y. Aug. 13, 2007)

Upon a showing that: (1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant, a plaintiff is entitled to recover thereon. *Promuto v. Waste Mgmt., Inc.*, 44 F.Supp.2d 628, 642 (S.D.N.Y. 1999), *citing, CBS, Inc. v. Ziff-Davis Publishing Co.,* 75 N.Y.2d 496, 501-06 (1990) and *Ainger v. Michigan Gen. Corp.,* 476 F.Supp. 1209 (S.D.N.Y. 1979), *aff'd*, 632 F.2d 1025 (2d Cir. 1980).

**Wells Fargo's Claims**

In its Second Amended Complaint, Plaintiff Wells Fargo pleads four claims for relief: Count I: breach of warranty as to a loan made by LaSalle to Bonita Rooths (the "Rooths Loan"); Count II, breach of warranty as to a loan made to Ryan Priest (the "Priest Loan"); Count III, fraud as to the Priest Loan; and Count IV, as an alternative to Count III, negligent misrepresentation as to the Priest Loan. Wells Fargo seeks summary judgment on Counts I and II.

Wells Fargo claims LaSalle breached Representation and Warranty 23 as respects the Priest Loan in the following ways:

1.    Failure to obtain an HVAC inspection of the furnace and to hold back 125% of the cost of repairing the furnace from the loan proceeds.

2.    Failure to obtain a property condition assessment of the Priest properties.

3.    Failure of LaSalle to ensure Mr. Priest had three months' principal and interest in cash-available reserves following the closing of his loan.

4.    Existence of many housing code violations at 8 Williams Court, one of the two Priest properties.

5.    One or more of the Priest properties had deferred maintenance and required significant rehabilitation.

6.    Failure of LaSalle to follow up on the Repair Letter.

7.    The Priest loan had poor loan characteristics including the condition of the properties, and the facts that Priest was an inexperienced property manager with a low credit score and an income of only $2,000 per month.

(Wells Fargo's Motion, Doc. No. 110, at 34-36.)

Wells Fargo claims LaSalle breached Representation and Warranty 13 as respects the Priest

Loan in the following ways:

1.       Priest's failure to make the repairs listed in the Repair Letter within 180 days of the loan closing.

2.       Code violations existed at the property, in violation of § 6(e) of the Priest Mortgage.

3.       Priest misrepresented his utility expenses.

(Wells Fargo's Motion, Doc. No. 110, at 36-37.)

Wells Fargo claims LaSalle breached Representation and Warranty 6 in that Priest executed a second mortgage on the property in favor of Beau Langevin for $20,000 which was in place as of March 30, 2006 (Wells Fargo's Motion, Doc. No. 110, at 38).

Wells Fargo claims LaSalle breached Representation and Warranty 23 as respects the Rooths Loan in the following ways:

1.       LaSalle obtained an unjustified upward revision of the appraisal for the Rooths' property.

2.       LaSalle failed to inform investors in the Asset Summary Report that two separate valuations had been reached.

3.       The Rooths loan was borderline in that the property was in LaSalle's lowest classification for the MFG program and Ms. Rooths was not credit worthy.

4.       Ms. Rooths' misrepresented her net worth.

5.       LaSalle failed to follow up on the Repair Letter.

(Wells Fargo's Motion, Doc. No. 110, at 39-40.)

Wells Fargo claims LaSalle violated Representation and Warranty 13 as respects the Rooths loan in the following ways:

1.       Ms. Rooths did not, within 180 days of the closing of her loan, make the repairs required by the Repair Letter she signed before her loan closed.

2.       Ms. Rooths misrepresented the occupancy rate at the property.

3.      Ms. Rooths represented she owned 100% of three unencumbered parcels of real estate when in fact she only had an undivided 50% interest.

(Wells Fargo's Motion, Doc. No. 110, at 41-42.)

## LaSalle's Claims

LaSalle seeks summary judgment on all of Wells Fargo's claims. LaSalle asserts it, and not Wells Fargo, is entitled to summary judgment on Wells Fargo's claims for violation of Representation and Warranty 23 because:

1.      Representation and Warranty 23 does not encompass underwriting so that any failures of LaSalle as to underwriting are not breaches of warranty.

2.      In any event, Wells Fargo has not demonstrated that LaSalle failed to meet industry underwriting standards.

3.      Evidence that LaSalle failed to meet its own underwriting guidelines is not competent evidence that it failed to meet industry underwriting standards.

4.      Information LaSalle disclosed to investors does not show a breach of Representation and Warranty 23.

5.      LaSalle met industry underwriting standards.

6.      Wells Fargo did not give prompt notice of its Rooths' loan claim of breach of Representation and Warranty 23.

(LaSalle's Summary Judgment Motion, Doc. No. 111, at 28-34; LaSalle's Memorandum in Opposition, Doc. No. 130, at ii-iii.)

LaSalle asserts it, and not Wells Fargo, is entitled to summary judgment on Wells Fargo's claims for violation of Representation and Warranty 13:

1.     As to the Repair Letters because:

     1.     Wells Fargo cannot prove material and adverse effect on either the Mortgage Loans or the Mortgaged Properties.

     2.     Wells Fargo cannot prove the repairs were not made.

2.     As to the code violations on the Priest property because:

     1.     Representation and Warranty 13 does not apply to code violations because another more specific warranty, Representation and Warranty 22, covers code violations.

     2.     Wells Fargo cannot prove that (1) there were conditions at the Priest property which created a threat of adverse action by the City of Biddeford, Maine, or (2) LaSalle knew of the threat.

3.     As to misrepresentations by the borrowers because:

     1.     The MLPA does not contain a representation and warranty which encompasses borrower misrepresentations.

     2.     The borrower misrepresentations on which Wells Fargo relies do not breach ¶ 27 of the Mortgages.

     3.     Wells Fargo has not shown that the borrowers knew their representations were false or that there was a material breach of any agreement between Rooths and LaSalle.

(LaSalle's Summary Judgment Motion, Doc. No. 111, at 10-27; LaSalle's Memorandum in Opposition, Doc. No. 130, at iv-v.)

LaSalle asserts it, rather than Wells Fargo, is entitled to summary judgment on Wells Fargo's claim for violation of Representation and Warranty 6 because Wells Fargo cannot show any material adverse effect caused by the second mortgage. (LaSalle's Summary Judgment Motion, Doc. No. 111, at 21; LaSalle's Memorandum in Opposition, Doc. No. 130, at v.)

Finally, LaSalle asserts it is entitled to summary judgment on Wells Fargo's Counts III and

IV for fraud or negligent misrepresentation (LaSalle's Summary Judgment Motion, Doc. No. 111, at 34-44.

## Uncontested Facts

LaSalle Commercial Mortgage Securities, Inc., as the Depositor; GMAC Commercial Mortgage Corporation (nka Capmark Finance, Inc.) as the Master Servicer; Crown Northcorp, Inc., as the Special Servicer; Plaintiff Wells Fargo Bank, N.A., as the Trustee; and LaSalle Bank National Association as the Paying Agent entered into a Pooling and Service Agreement (the "PSA"), dated as of March 30, 2006. LaSalle Commercial Mortgage Securities, Inc., as the Purchaser and LaSalle Bank National Association as the Seller entered into a Mortgage Loan Purchase Agreement (the "MLPA"), dated the same day. A trust was created pursuant to the PSA whose corpus consisted of more than $400 million in commercial real estate mortgage loans. The trust elected to be treated as a real estate mortgage investment conduit under the Internal Revenue Code of 1986. Such a trust represents a pool of mortgages, the beneficial ownership of which has been sold to various investors in the form of certificates representing their ownership interest in the pooled mortgages. The series of certificates covered by the PSA and MLPA is known as the Series 2006-MF2 series. If a real estate mortgage investment conduit complies with the relevant Internal Revenue Service regulations, mortgage payments made to the trust can be passed through to the beneficial owners (the "Certificateholders") without being subject to federal income tax.

As provided by § 13 of the MLPA, LaSalle transferred to LaSalle Commercial Mortgage Securities, Inc., its rights under the notes for the pooled loans and mortgages. LaSalle Commercial

assigned those rights to Wells Fargo as Trustee for the Certificateholders. Wells Fargo[1], as Trustee and assignee of LaSalle Commercial, brings this action alleging a number of breaches of the MLPA.

Beginning in 1995 and continuing until early 2008, after LaSalle had been acquired by and merged into Bank of America Corp., LaSalle had a multifamily finance group which "originated, underwrote and approved loans of less than $5 million, secured predominantly by multifamily dwellings." (LaSalle's Motion for Summary Judgment, Doc. No. 111, at 4.) The first pool of loans to be "securitized[2]" by LaSalle was assembled in December, 2005. *Id.* LaSalle's second securitized pool of mortgages included the two loans at issue in this case, one made to borrower Bonita Rooths and secured by property in Dayton, Ohio (the "Rooths Loan") and one made to borrower Ryan Priest and secured by property in Biddeford, Maine (the "Priest Loan"). The Rooths and Priest loans were made by LaSalle in September, 2005.

Wells Fargo asserts breaches of the following representations and warranties in the MLPA:

1. **Representation and Warranty 6.** Each Mortgage Loan is secured by the related Mortgage which establishes and creates a valid and subsisting first priority lien on the related Mortgaged Property, or encumbrances, participation interests, pledges, charges or security interests subject only to Permitted Encumbrances. Such Mortgage establishes and creates a first priority security interest in favor of the Seller in all personal property owned by the Mortgagor that is used in, and is reasonably necessary to, the operation of the related Mortgaged Property. There exists with respect to such Mortgaged Property owned by the Mortgagor that is used in , and is reasonably necessary to, the operation of the related Mortgaged Property. There exists with respect to such Mortgaged Property an assignment of leases and rents provision, either as part of the related Mortgage or as a separate document or instrument, which establishses and creates a first priority security interest in and to leases and rents arising in respect of the related Mortgaged Property, subject only to Permitted Encumbrances. To the Seller's knowledge, no person other than the related Mortgagor and the mortgagee own any interest in any payments due under the related leases. The related Mortgage or such assignment of leases and rents provision provides for the appointment of a receiver for rents or allows the holder ot the related Mortgage to enter into possession of the related Mortgages Property to collect rent or provides for rents to be pain directly to the

---

[1]Wells Fargo brought the action by and through Crown NorthCorp, the Special servicer under the PSA.

[2]"Securitization" is the name for the process by which loans are bundled and deposited in a trust with interests in the pooled loans being sold as certificates.

holder of the related Mortgage in the event of a default beyond applicable notice and grace periods, if any, under the related Mortgage Loan documents. As to the origination date there were, and, to the Seller's actual knowledge as of the Closing Date, there are, no mechanics' or other similar liens or claims which have been filed for work, labor or material affecting the related Mortgaged Property which are or may be prior or equal to the lien of the Mortgage, except those that are bonded or escrowed for or which are insured against pursuant to the applicable Title Insurance Policy (as defined below) and except for Permitted Encumbrances. No Mortgaged Property secures any mortgage loan not represented on the Mortgage Loan Schedule; no Mortgage Loan is cross-collateralized or cross-defaulted with any other mortgage loan other than one or more Mortgage Loans as shown on the Mortgage Loan Schedule; no Mortgage Loan is secured by property which secures another mortgage loan other than one or more Mortgage Loans as shown on the Mortgage Loan Schedule. Notwithstanding the foregoing, no representation is made as to the perfection of any security interest in rent, operating revenues or other personal property to the extent that possession or control of such items or actions other than the recording of the related Mortgage are required in order to effect such perfection.

2.. **Representation and Warranty 13.** There exists no material default, breach, violation or event of acceleration (and, to Seller's knowledge, no event which, with the passage of time, with the giving of notice, or both, would constitute any of the foregoing) under the documents evidencing or securing the Mortgage Loan, in any such case to the extent the same materially and adversely affects the value of the Mortgage Loan and the related Mortgaged Property; provided, however, that this representation and warranty does not address or otherwise cover any default, breach, violation or event of acceleration that specifically pertains to any matter otherwise covered by any other representation and warranty made by the Seller.

3. **Representation and Warranty 23.** The origination, servicing and collection practices used by the Seller or, to its knowledge, any prior holder of the related Mortgage Note with respect to such Mortgage Loan have been in all material respects legal and have met customary industry practices.

(Exhibit B to MLPA, Representations and Warranties of the Seller, at ¶¶ 6, 13, and 23, quoted in part,

Wells Fargo's Motion, Doc. No. 110, at 3.) Exhibit B is incorporated by reference into the MLPA

at § 6(c).

**Analysis**

1.     **Does the phrase "origination, servicing and collection practices" in Representation and Warranty 23 include underwriting practices?**

LaSalle asserts that this language, clear and unambiguous in itself, does not include underwriting practices and that it is therefore entitled to summary judgment on all of Wells Fargo's claims for breach of Representation and Warranty 23. LaSalle cites the well-established rule that all words in a contract are to be given meaning and not to be interpreted as superfluous if possible. (LaSalle's Motion for Summary Judgment, Doc. No. 111, at 30-31, citing, *inter alia*, Restatement (Second) of Contracts§ 203, at 93 (1981); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'"). Conceding that the MLPA does not define these words, LaSalle then cites other provisions of the MLPA where the words "underwriting" and "origination" are used separately from one another:

> In a paragraph describing the meaning of the term "to the Seller's knowledge," the parties state that that term shall mean:
>
>> that no officer, employee or agent of the Seller responsible for the underwriting, origination or sale of the Mortgage Loans . . . believes that a given representation or warranty is not true or inaccurate . . . .
>
> (See MLPA, at B-14.) Later, the parties define the term "to the Seller's actual knowledge" to mean:
>
>> that an officer, employee or agent of the Seller responsible for the underwriting, origination and sale of the Mortgage Loans does not actually know of any facts or circumstances that would cause such person to believe that such representation or warranty was inaccurate.
>
> (*Id.*)

(LaSalle's Motion for Summary Judgment, Doc. No. 111, at 31.) The separate use, of course, implies a distinction in the drafters' and negotiators' minds, one not to be ignored under the "no superfluous language" principle.

Neither party offers the Court a functional definition of either "origination" or "underwriting." Wells Fargo's expert, John D'Andrea, offers his opinion that

> [I]n the context of the mortgage lending industry, loan underwriting is part of the loan origination process, or in other words, origination includes underwriting. The term "origination" generally refers to the process that starts with an initial contact with a prospective borrower and ends with the closing and/or funding of a loan secured by real estate, and thereby includes underwriting. The term "origination" generally provides a distinction between activities leading to the creation of a loan and those activities that occur after a loan exists, such as loan servicing and secondary market transactions.

(D'Andrea Affidavit, Exhibit B to Doc. No. 125, at ¶ 5.) This provides some evidence that "origination" includes "underwriting."

Wells Fargo argues that LaSalle is judicially estopped from asserting that "origination" does not include "underwriting" by the position it has taken in other litigation, *LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortgage Lending, Inc.*, 2007 U.S. Dist. LEXIS 59303 (S.D.N.Y. Aug. 13, 2007). In that case, the relevant representation and warranty read "The origination (or acquisition, as the case may be), servicing and collection practices used by [Merrill] with respect to the Mortgage Loan have been in all respects legal and have met customary industry standards for servicing of commercial mortgage loans for conduit loan programs." In that case LaSalle as Wells Fargo took the position that "origination" included not only solicitation of the loan and its underwriting, but also extended through the securitization process.

LaSalle responds that in the *Merrill Lynch* case it was appearing in its capacity as trustee whereas here it appears as the seller under the MLPA and judicial estoppel does not apply under those circumstances, citing *Mitchell v. Chapman,* 343 F.3d 811, 823 (6th Cir. 2003). *Mitchell,*

however, is a claim preclusion, not a judicial estoppel case, and therefore does not support LaSalle's "different capacity" argument.

The doctrine of judicial estoppel "forbids a party 'from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.'" *Griffith v. Wal-Mart Stores*, 135 F.3d 376, 380 (6th Cir. 1998), quoting *Teledyne Indus., Inc. v. Nat'l Labor Relations Bd.*, 911 F.2d 1214, 1217 (6th Cir. 1990). Courts apply judicial estoppel in order to "preserve[] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposing to suit an exigency of the moment." *Id.* quoting *Teledyne*, 911 F.2d at 1218. The doctrine applies only when a party shows that his opponent: (1) took a contrary position; (2) under oath in a prior proceeding; and (3) the prior position was accepted by the court. *Id.*

LaSalle argues its position in the *Merrill Lynch* case involved a different contract with different parties. While that is so, the differences appear to be immaterial, given the context of the argument. The language in dispute was being used in a functionally identical document for what appear to be the same purposes as the language is used here. LaSalle's position in that case necessarily implied that underwriting was part of origination.

However, LaSalle did not prevail in *Merrill Lynch*. Judge Leisure held that origination did not unequivocally and unambiguously include **securitization**, which was the precise question before him. He did not have occasion to decide whether it included underwriting. And in any event, LaSalle was not successful: Judge Leisure denied its motion for summary judgment and held "[c]ourts look to extrinsic evidence concerning trade usage of a contract term regardless of whether the term is found to be ambiguous. See, e.g., *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987) (citing N.Y.U.C.C. § 2-202 and Official Comments thereto)." *Merrill Lynch, supra,* at n. 13. Therefore LaSalle is not judicially estopped to deny that "origination" includes

"underwriting" by the position it took in *Merrill Lynch*.

While LaSalle's usage of the word "origination" in *Merrill Lynch* does not estop it from arguing for a different usage here, it does stand essentially as an admission by a party opponent that the word "origination," when used in the precise context at issue here – the representations and warranties in a mortgage loan purchase agreement involving securitization of commercial real estate loans – can include underwriting. This establishes to the Court's satisfaction that the word "origination" as used in Representation and Warranty 23 is ambiguous.

> Where, as here, the question before the court on a summary judgment motion concerns the interpretation of a contract, "summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). However, "where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become [sic] an issue of fact and summary judgment is inappropriate." *Id.; accord Painton & Co. v. Bourns, Inc.,* 442 F.2d 216, 233 (2d Cir. 1971) (Friendly, J.) ("When a contract is so ambiguous as to require resort to other evidence to ascertain its meaning and that evidence is in conflict, the grant of summary judgment is improper.").

*Merrill Lynch, supra*, at *20-21. Therefore summary judgment for either party dependent upon that party's interpretation of the word "origination" in Representation and Warranty 23 is denied.

### 2. Can Wells Fargo demonstrate LaSalle failed to meet industry standards?

Wells Fargo seeks summary judgment on its claim that LaSalle failed to meet customary industry standards in its origination and underwriting of these two loans. (Wells Fargo Motion, Doc. No. 110, at 33-39.) LaSalle counters that the evidence proffered by Wells Fargo to show its underwriting practices did not meet customary industry standards is insufficient to withstand summary judgment because expert testimony is required and:

1. The relevant testimony of Paul Gembara is incompetent under both Fed. R. Evid. 702

and 701.

2.      The relevant testimony of John D'Andrea fails to identify the industry standards violated and he is also not qualified to give such opinions.

(LaSalle Memo Opp. Doc. No. 130, at 10-13.)  LaSalle relies on the motions in limine it has made to exclude this evidence.  Wells Fargo does not dispute that expert evidence is needed and relies on its opposition to the motions in limine.  (Wells Fargo Reply Memo, Doc. No. 114, at 9.)

Because the Court has denied LaSalle's motion to exclude the D'Andrea testimony and concludes in the next section that proof that LaSalle failed to meet its own underwriting guidelines is competent evidence of its failure to meet industry standards, LaSalle's motion for summary judgment on this point is denied, without considering the question of Mr. Gembara's competence. Because the Court has limited its denial of the exclusion of Dr. D'Andrea by requiring that his testimony at trial provide a fuller foundation for his familiarity with industry standards, Wells Fargo's motion for summary judgment on this question 9 is also denied.

### 3.      Is evidence of LaSalle's failure to meet its own internal underwriting guidelines competent to prove it failed to meet industry standards?

LaSalle asserts that evidence that it did not meet its own internal underwriting guidelines is not competent to prove it failed to meet industry standards.  (LaSalle Memo Opp. Doc. No. 130, at 13.)   Wells Fargo replies by arguing the cited authority does not relate to the financial context at issue here and cites instead *LaSalle Bank Nat'l Assoc. v. Lehman Bros. Holding, Inc.,* 237 F. Supp. 2d 618 (D. Md. 2002).  That case involved a similar transaction to the one in suit, but in which LaSalle was the trustee for certificateholders.  In seeking summary judgment, LaSalle "argues that the origination and underwriting practices of Holliday and Lehman with respect to the FEL Facility Mortgage Loan did not meet Lehman's own underwriting guidelines nor did they meet industry

standards" and therefore Holliday and Lehman breached their warranty that "the origination, servicing and collection practices used by [Lehman] or any prior holder of the Mortgage Note have been in all respects legal, proper and prudent and have met customary industry standards." *Id*. at 630. In that case Judge Harvey accepted LaSalle's argument and found that proof that Lehman Bros. did not follow their own underwriting guidelines was sufficient proof of breach of the relevant warranty to merit summary judgment in LaSalle's favor.

This Court concludes that evidence that LaSalle did not meet its own internal underwriting guidelines is competent evidence it did not meet customary industry standards for underwriting. Indeed, it comes close to judicial estoppel on this point, which the Court declines to find because it has not been argued by Wells Fargo.

## 4. Is evidence of what LaSalle told investors relevant to any claim of breach of Representation and Warranty 23?

Wells Fargo argues that LaSalle's failure to inform investors in the Asset Summary Report about the revaluation of the Rooths property violated Representation and Warranty 23 (Wells Fargo's Motion, Doc. No. 110, at 39). LaSalle responds that any such information was provided well after the loans were closed (LaSalle Memo. Opp., Doc. No. 130, at 14). Wells Fargo clarifies that this evidence is offered to show that the breaches that did occur had a material and adverse effect (Wells Fargo Reply at 11.) The Court will construe the proffered evidence in light of Wells Fargo's clarification.

## 5. Does LaSalle's proffered evidence show conclusively that it met customary industry standards?

To show that it, rather than Wells Fargo is entitled to summary judgment on Wells Fargo's claims of breach of Representation and Warranty 23, LaSalle relies on the testimony of its expert

witness, David Abshier (LaSalle Memo Opp., Doc. No. 130, at 14-18.)  Wells Fargo responds that the conclusory testimony of an expert is not sufficient to create a genuine issue of material fact in a case such as this, relying on *Hayes v. Douglas Dynamics*, 8 F.3d 88, 92 (1st Cir. 1993)("appellants' experts' opinions did not contain sufficient detail to support their conclusory assertions about ultimate legal issues. . . . the experts' opinions must have included the factual basis and the process of reasoning to make the conclusion viable in order to defeat a summary judgment motion, and *Merit Motors v. Chrysler Corp.*,  569 F.2d 666, 673 (D.C. Cir. 1977)(testimony of the dealers' expert witness insufficient to avoid summary judgment as it was based solely on speculation and hypothesis and was unsubstantiated by any evidence in the record.)

The Court concludes that Mr. Abshier's report and subsequent deposition testimony on this issue is sufficient to create a genuine issue of material fact but not sufficiently conclusive to warrant summary judgment in LaSalle's favor.  Each party's motion for summary judgment on this issue is denied.


**6.      Should Wells Fargo's Claim regarding Representation and Warranty 23 as to the Rooths' loan be denied because Wells Fargo failed to give prompt notice of its claim?**

LaSalle asserts Wells Fargo's claim of breach of Representation and Warranty 23 as to the Rooths' loan should be dismissed because Wells Fargo failed to give prompt notice of the claim of breach, relying on § 6(g) of the MLPA which provides that "[e]ach party hereby agrees to promptly notify the other party of any Breach of a representation or warranty."  LaSalle contends that notice of breach was not given until nine months after this litigation was filed and fifteen months after Wells Fargo demanded repurchase of the Rooths loan (LaSalle's Motion, Doc. No. 111, at 32-34; LaSalle Memo Opp., Doc. No. 130, at 18).

Wells Fargo does not dispute that it did not give notice of breach of Representation and Warranty 23 as to the Rooths loan until August 22, 2008.  It claims this notice was timely because

it was given promptly after Wells Fargo learned certain facts with respect to the reappraisal of the Rooths property in discovery in this case (Wells Fargo Memo Opp., Doc. No. 125, at 17-19.)

The Court concludes that, given the amount of relevant and material information provided to Wells Fargo in discovery, the Court cannot conclude as a matter of law that Wells Fargo's notice of breach following receipt of much of that information in August, 2008, was not prompt notice within the meaning of § 6(g) of the MLPA. LaSalle's motion for summary judgment on this defense is denied.

### 7. Do borrower misrepresentations in the loan application process either directly or indirectly violate Representation and Warranty 13?

Both Bonita Rooths and Ryan Priest made a number of factual misrepresentations in the paperwork they presented to LaSalle in support of their loan applications. LaSalle argues it did not warrant the accuracy of these documents in Representation and Warranty 13 in that they are not "documents evidencing or securing the Mortgage Loan." (LaSalle Motion, Doc. No. 111, at 11.)

Wells Fargo responds that it does not contend the loan application documents are described in Representation and Warranty 13. Rather, it says, the borrowers violated ¶ 27 of the mortgage by making these misrepresentations which resulted in the mortgages being in default as of the date of securitization, March 30, 2006 (Wells Fargo Memo Opp., Doc. No. 125, at 6.) Certainly the two mortgages are "documents evidencing or securing the Mortgage Loan."

Wells Fargo does not quote the language of ¶ 27 or even cite to where it appears in the record. LaSalle, however, does quote the language from the Rooths' mortgage as follows:

> ACCELERATION; REMEDIES. Upon Borrower's breach of any covenant or agreement of Borrower in this Instrument, or in any other loan agreements or financing arrangements now existing or hereafter entered into between Borrower and Lender, including, but not limited to, the covenants to pay when due any sums secured by this Instrument, Lender at Lender's option may declare all of the sums secured by this Instrument to be immediately due and payable without

> further demand and may foreclose this Instrument by judicial proceeding and may invoke any other remedies permitted by applicable law or provided herein. . . .

(Quoted from Exhibit 75 to the Owen Deposition.)  Paragraph 27 of the Priest mortgage is slightly different.  It provides for acceleration of the debt upon breach of the "Loan Documents," defined as the note and other documents "executed in connection with the Note."

Wells Fargo points to no language in the two mortgages in which either borrower purports to warrant the accuracy of representations made in the loan application process.  The ordinary reading of the two remedies provisions quoted aboce would be to give LaSalle or its assignee a remedy if either borrower breaches a promise about future behavior, particularly paying the notes.

On this point, there is no genuine issue of material fact and LaSalle is entitled to judgment as a matter of law.  The Court concludes that borrower misrepresentations made in the loan application process do not violate ¶ 27 of either mortgage and therefore their existence does not breach Representation and Warranty 13.

**8.      Does Representation and Warranty 13 cover code violations at 8 Williams Court, one of the Priest properties?**

The City of Biddeford, Maine, issued a Notice of Violation as to 8 Williams Court, one of the Priest properties, on September 26, 2007, noting 37 code violations at that address and declaring the building an unsafe structure.  Wells Fargo contends these code violations put Mr. Priest in default of § 6(e) of his mortgage on that property which required that he "comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property."  Of course, if Priest were in default on the date of securitization, that would place LaSalle in breach of Representation and Warranty 13, assuming the default was material.

LaSalle, however, argues that Representation and Warranty 13 does not apply to these code violations because the more specific Representation and Warranty 22 applies.  That Representation and Warranty reads:

(22) To the Seller's actual knowledge, there are no actions, suits, arbitrations or governmental investigations or proceedings by or before any court or other governmental authority or agency now pending against or affecting the Mortgagor under any Mortgage Loan or any of the Mortgaged Properties which, if determined against such Mortgagor or such Mortgaged Property, would materially and adversely affect the value of such Mortgaged Property, the security intended to be provided with respect to the related Mortgage Loan, or the ability of such Mortgagor and/or the current use of such Mortgaged Property to generate net cash flow to pay principal, interest and other amounts due under the related Mortgage Loan; and to the Seller's actual knowledge there are no such actions, suits or proceedings threatened against such Mortgagor.

(Quoted in LaSalle Motion, Doc. No. 111, at 18.)

Wells Fargo agrees with LaSalle's proposed contract construction principle: if the subject matter is covered by a more specific covenant, that will govern over the more general covenant (Wells Fargo Memo Opp., Doc. No. 125, at 7.) However, it says, Representation and Warranty 22 does not apply because the adverse governmental action in question did not occur until a year and a half after securitization.

Wells Fargo's argument misses the point. The question is not when actual code violation proceedings occurred or were threatened. Rather the question is whether Representation and Warranty 22 or Representation and Warranty 13 covers the subject matter.

The Court concludes that Representation and Warranty 22 is not applicable. The subject matter of that warranty is LaSalle's knowledge on the securitization date of any adverse governmental action, pending or threatened, as of the securitization date. The subject matter of Representation and Warranty 13 is whether there are any material breaches or defaults of the loan documents on the date of securitization, whether or not any such defaults have given rise or might give rise to adverse governmental action. Wells Fargo is entitled to summary judgment on the issue of whether Representation and Warranty 22 applies to the code violation claim.

**9.      Does Wells Fargo have competent evidence that the code violations existed on March 30, 2006?**

Wells Fargo claims that the code violations constituted a breach of Representation and Warranty 13 because they existed on March 30, 2006, and violated § 6(e) of the Priest Mortgage (Wells Fargo Motion, Doc. No. 110, at 14.) LaSalle argues Wells Fargo has no competent evidence of the condition of 8 Williams Court on March 30, 2006 (LaSalle Motion, Doc. No. 111, at 19.) LaSalle points to admissions made in discovery by Wells Fargo's representatives that they made no inspections of that property until well after the securitization date. *Id.*

Wells Fargo responds that LaSalle's own expert, David Abshier, identified some of the code violations as permanent features of the building. (Wells Fargo Memo Opp., Doc. No. 125, at 8.) LaSalle responds that its expert's comments to this effect have been taken out of context and he never visited the property. (LaSalle Reply Memo, Doc. No. 146, at 4, n.3.)

The Court disagrees with LaSalle's analysis. Such code violations as having windows that are too small or having only one means of egress from a dwelling unit are permanent structural features of a building. There is a genuine issue of material fact as to whether 8 Williams Court was in violation of the relevant housing code of the City of Biddeford, Maine, on March 30, 2006. LaSalle's summary judgment motion on this issue is denied.


**10.      Does the Priest second mortgage violate Representation and Warranty 6?**

Shortly after he closed the loan with LaSalle, Ryan Priest gave a second mortgage on the two relevant properties to Beau Langevin to secure a loan of $20,000. That mortgage was in place as of the securitization date and not listed on the schedule of mortgages which is part of the MLPA. Wells Fargo claims this violates Representation and Warranty 6 which provides in pertinent part: [n]o Mortgaged Property secures any mortgage loan not represented on the Mortgage Loan Schedule. . . ."

There is no genuine issue of material fact as to the existence of this second mortgage as of March 30, 2006, or that it is described by the quoted language from Representation and Warranty 6. LaSalle asserts, however, that it is entitled to summary judgment on this claim because Wells Fargo cannot "prove that the alleged breach 'materially and adversely affect[ed] the value of [the] Mortgage Loan, the related Mortgaged Property or the interests of the Trustee or any Certificateholder in the Mortgage Loan or the related Mortgaged Property'" and indeed has "admitted facts demonstrating the *absence* of any evidence of a material adverse effect." (LaSalle Motion, Doc. No. 111, at 21; emphasis sic.) LaSalle relies on the deposition testimony of Wells Fargo's representative Roy Owen. *Id.*

Wells Fargo responds with two items of evidence it says show there was a material adverse effect:

1.     LaSalle denied Ryan Priest's application for a loan of $656,000, but lent him $636,000. "Therefore, there is no question that if Defendant had been aware of the second mortgage, it either would not have made the loan at all or it would have made some change in the structure of the loan." (Wells Fargo Memo Opp., Doc. No. 125, at 10.)

2.     Morever, Wells Fargo says,

> [A] loan in the amount of $656,000 would have exceeded Defendant's maximum loan to value ("LTV") ratio of 80%, as set forth in Defendant's underwriting guidelines. Therefore, for that additional reason, there is strong evidence that the Priest Loan never would have been made if Defendant had been aware of the second mortgage, all of which is supportive of the conclusion that the admitted breach of Representation 6 had a material and adverse effect.

*Id.*

This evidence, taken together with Dr. D'Andrea's report, creates a genuine issue of material fact on the materiality of this breach of Representation and Warranty 6. Therefore LaSalle is not entitled to summary judgment on Wells Fargo's claim that the Langevin mortgage breached

Representation and Warranty 6.  Wells Fargo is entitled to summary judgment on the issues of whether the second mortgage existed on March 30, 2006, and whether its existence breached Representation and Warranty 6.

**11.      Do the failures of Rooths and Priest to make repairs called for in Repair Letters sent to them by LaSalle constitute a breach of Representation and Warranty 13?**

LaSalle sent both borrowers so-called Repair Letters requiring that certain repairs be made to the relevant properties within six months' time from their loan closings.  Wells Fargo claims that at least some of these repairs were not made, resulting in a breach of Representation and Warranty 13.  The Repair Letters provide that "If Borrower fails to meet these conditions within 180 days of the Closing Disbursement Date, such failure shall be an Event of Default under the terms of the Loan Documents, and Lender may . . . declare the loan balance immediately due and payable."  (Wells Fargo Motion, Doc. No. 110, at 23, quoting DepEx. 44.[3])  Both loans were made in September, 2005, so that the 180-day repair period would have expired prior to the securitization date, March 30, 2006.

The evidence cited by Wells Fargo in its Memorandum in Opposition (Doc. No. 125 at 10-13) establishes that there are genuine issues of material fact as to whether the Repair Letters were obeyed and whether the failure to do so had a material adverse effect on one or more of the properties.  In particular, citation of one of the uncompleted repairs as a code violation resulting in 8 Williams Court's being declared unsafe is sufficient evidence from which a jury could infer materiality.

**12.      Is LaSalle entitled to summary judgment on Wells Fargo's fraud claim?**

The Second Amended Complaint alleges in pertinent part:

---

[3]Apparently the parties created a numbering scheme for deposition exhibits which carries over from one deposition to the next.  No index of those exhibits has been filed with the Court, although Wells Fargo's counsel has furnished at least a partial index.

Defendant's Actions Involving the Priest Loan That Amounted to Fraud

46. During the underwriting process in the Priest Loan, a property inspection report regarding the Priest collateral properties was prepared by National Field Representatives ("the NFR report"). The NFR report noted that the "furnace and electrical boxes appear to be aging with areas of rusting" and that the furnace appeared to be "weathered" and "older." The NFR report was received and reviewed by Paul Gembara, the individual at LaSalle who was ultimately responsible for approving loans, and for deciding whether exceptions to LaSalle's underwriting guidelines should be made. After reviewing the NFR report, Mr. Gembara placed a requirement on the Priest Loan that an HVAC inspection by a licensed inspector would have to be conducted before the loan could close and that the cost of the estimated repairs would be held back at closing in an amount equal to 125% of the estimated repairs.

47. A little more than one month after Mr. Gembara placed the HVAC requirement on the loan, and approximately one week before the scheduled loan closing, the HVAC inspection had still not been conducted at the Priest collateral properties. By this time (the third week of September 2005), the loan broker and borrower were expressing impatience and frustration that the Priest Loan had not yet been closed.

48. Even though the HVAC inspection had not been conducted as Mr. Gembara had initially required on or about August 11, 2005, on or about September 23, 2005, Mr. Gembara removed and waived the HVAC requirement, and permitted the Priest Loan to close without the HVAC inspection being done. As a basis for waiving the requirement, Mr. Gembara noted that the NFR report had characterized the Priest collateral properties as being in "good" condition, despite the fact that Mr. Gembara had relied upon the identical NFR report in placing the HVAC requirement on the Priest Loan in the first place.

49. Subsequent to the closing of the Priest Loan, a document describing features of the Priest Loan was prepared by LaSalle and provided to potential investors, including the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2. In this document, which was called an "Asset Summary" for the Priest Loan, LaSalle represented to potential investors: "All HVAC's will be inspected by a licensed party. A hold back will be required." These statements were false and material misrepresentations.

\* \* \* \* \* \* \*

64. LaSalle prepared an Asset Summary document regarding the Priest

Loan, which was given to ratings agencies and potential investors, including the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2

65. LaSalle represented in the Asset Summary that: "All HVAC's will be inspected by a licensed party. A hold back will be required."

66. These statements were false and material misrepresentations and LaSalle knew they were false or acted with such utter disregard and recklessness as to whether the statements were true or false that knowledge may be inferred.

67. LaSalle did not reveal in the Asset Summary that the HVAC requirement had been waived by LaSalle one week before loan closing, and that the LaSalle employee who had waived the requirement relied on the same NFR Report upon which he had relied in establishing the requirement in the first place.

68. The misrepresentations (by omission and commission) were material.

69. LaSalle was aware that potential investors, including the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2, would rely on the misrepresentations and omissions in the Asset Summary in deciding whether to request that the Priest Loan be excluded from the pool of loans. Indeed, LaSalle acted with the intent to mislead the investors into relying upon the misrepresentations and omissions.

70. In fact, the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2 did justifiably rely on the misrepresentations and omissions in the Asset Summary and the misrepresentations and omissions were a material factor in the decision to not exclude the Priest Loan from the pool of loans.

71. As a proximate result of this reliance by the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2 on said representations and omissions, the Certificateholders were damaged.

72. In making said representations, Defendant acted with malice and/or recklessness and/or in conscious disregard of Plaintiff's known legal rights and is therefore liable for punitive damages.

73. As a direct and proximate result of Defendant's intentional misrepresentations and omissions, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than $660,000, plus punitive damages, attorneys' fees and costs, and interest.

(Doc. No. 49 at 16-17, 20-22.

LaSalle contends the Court should apply New York law to this tort claim and to Count IV. (LaSalle Motion, Doc. No. 11, at 35, n. 12.)  Without offering an alternative choice, Wells Fargo responds under New York law "without waiving its ability to argue in other contexts that the law of a different jurisdiction might apply."  (Wells Fargo Memo Opp., Doc. No. 125, at 19, n. 67.)  The Court, however, is unwilling to decide LaSalle's Motion on a "hypothetical" choice of law.

As noted above, under *Klaxon v. Stentor, supra*, it is Ohio choice of law principles which govern and Ohio recognizes the validity of contractual choice of law provisions.  The choice of law provisions are slightly different, but each provides that "the obligations, rights and remedies of the parties hereunder shall be determined in accordance with [New York internal] laws."  The breadth of that language makes this case most similar to *Moses v. Business Card Express, Inc.*, 929 F. 2d 1131(6th Cir. 1991), where "[t]his Franchise and License Agreement and the construction thereof shall be governed by the laws of the State of Michigan" was found broad enough to require application of Michigan rather than Alabama tort law.  There is no indication the parties to these two contracts, the PSA and the MLPA, ever considered that their choice of law language did not encompass all legal issues arising out of the contractual relationship.  The Court will accordingly apply New York law to Wells Fargo's tort claims.

The elements of a fraud claim under New York law, as set forth by LaSalle, are

> (1) a false representation or omission of a material fact, (2) justifiable reliance by the plaintiff on that representation, (3) the representation was *intentionally made* to induce the plaintiff to rely, and(4) an actual injury as a result of such reliance. *See Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y. 2d 413, 421 (N.Y. 1996).

(LaSalle Motion, Doc. no. 111, at 35.)

New York law on proof of fraud was in recent times summarized in this Court as follows:

> [U]nder New York law the burden of proving fraud requires clear and convincing evidence, and not mere preponderance. See *Almap*

> *Holdings v. Bank Leumi Trust Co. of N.Y.*, 196 A.D.2d 518, 601
> N.Y.S.2d 319 (N.Y. App.Div. 1993), Iv. denied 83 N.Y.2d 754, 612
> N.Y.S.2d 378, 634 N.E.2d 979 (1994); *Hudson Feather & Down
> Prods. v. Lancer Clothing Corp.,* 128 A.D.2d 674, 675, 513 N.Y.S.2d
> 173 (N.Y. App. Div. 1987); *Orbit Holding Corp. v. Anthony Hotel
> Corp.*, 121 A.D.2d 311, 314, 503 N.Y.S.2d 780 (N.Y. App. Div.
> 1986). This evidentiary standard demands "a high order of proof" (
> *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211,
> 220, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978)) and forbids the
> awarding of relief "'whenever the evidence is  loose, equivocal or
> contradictory'".

*Procter & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270 (S.D. Ohio 1996)(Feikens, J., sitting by designation).

Putting to one side the questions of whether Wells Fargo actually relied on the misstatement regarding the Priest HVAV inspection and holdback and whether any such reliance would have been justified, the Court agrees with LaSalle that Wells Fargo has produced insufficient evidence from which a reasonable jury could infer, to a clear and convincing level, an intent to deceive on LaSalle's part. Wells Fargo is of course correct that there will seldom be direct evidence of fraudulent intent in a fraud case, and it must usually be inferred from circumstantial evidence.  However, the circumstantial evidence produced here is not sufficient to support that inference.[4]  LaSalle is entitled to summary judgment on Count III.

**13.**     **Is LaSalle entitled to summary judgment on Wells Fargo's negligent misrepresentation claim?**

In the Second Amended Complaint, Count IV reads as follows:

2. **COUNT IV: NEGLIGENT MISREPRESENTATION (Priest Loan)**

---

[4]The Court notes that the testimony of Paul Gembara, referenced as "critically important" by Wells Fargo, consists largely of one-word responses to detailed leading questions by the examining attorney.  (Wells Fargo Memo Opp. Doc. No. 125, at 21-22, n. 74.)

74. Plaintiff realleges and incorporates this Complaint's preceding paragraphs.

75. In the alternative to the fraud cause of action just asserted, Plaintiff asserts this cause of action for negligent misrepresentation.

76. LaSalle prepared an Asset Summary document regarding the Priest Loan, which was given to ratings agencies and potential investors, including the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2.

77. LaSalle negligently represented in the Asset Summary that: "All HVAC's will be inspected by a licensed party. A hold back will be required."

78. These statements were false and material misrepresentations and LaSalle failed to exercise reasonable care or competence in obtaining or communicating the information. LaSalle owed a duty to the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2 to exercise reasonable care or competence in obtaining or communicating this information.

79. In addition, LaSalle negligently did not reveal in the Asset Summary that the HVAC requirement had been waived by LaSalle one week before loan closing, and that the LaSalle employee who had waived the requirement relied on the same NFR Report upon which he had relied in establishing the requirement in the first place.

80. The misrepresentations (by omission and commission) were material.

81. LaSalle was aware that potential investors, including the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2, would rely on the misrepresentations and omissions in the Asset Summary in deciding whether to request that the Priest Loan should be excluded from the pool of loans.

82. In fact, the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2 did justifiably rely on the misrepresentations and omissions in the Asset Summary and the misrepresentations and omissions were a material factor in the decision to not exclude the Priest Loan from the pool of loans.

83. As a proximate result of this reliance by the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF2 on said representations and omissions, the Certificateholders were damaged.

84. As a direct and proximate result of Defendant's negligent misrepresentations and omissions, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than $660,000, attorney's fees and costs, and interest.

(Second Amended Complaint, Doc. No. 47, at 22-23.)

The elements of a negligent misrepresentation claim under New York law "(1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage." *JP Morgan Chase Bank v. Winnick,* 350 F. Supp. 2d 393, 401 (S.D.N.Y. 2004), quoting *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2nd Cir. 2003).

LaSalle notes that, as with fraud,

> Detrimental reliance is also an element of a claim of negligent misrepresentation. *See, e.g.*, *Meyercord v. Curry*, 832 N.Y.S.2d 29, 30 (N.Y. App. Div. 2007). In addition, to prevail on a claim for negligent misrepresentation a plaintiff has the burden to prove the existence of "a special relationship of trust or confidence." *H&R Project Assocs., Inc. v. City of Syracuse*, 737 N.Y.S.2d 712, 713 (N.Y. App. Div. 2001).

(LaSalle Motion, Doc. No. 111, at 35.)

LaSalle first claims that there was no actual reliance by the investors on the representation in the Priest Asset Summary that there would be an HVAC inspection and a holdback[5], relying on deposition testimony of the B-piece investors' representative, Mr. Hawkins. (LaSalle Motion, Doc. No. 111, at 38-39.) However, the Court is persuaded by Wells Fargo's argument (Doc. No. 125, at 22-23) that there is sufficient evidence to create a genuine issue of material fact as to whether there was the requisite actual reliance. LaSalle is not entitled to summary judgment on this issue.

LaSalle also asserts that any reliance would not have been justified because the investors

---

[5]

Those representations are made in the future tense, which would have been correct as of the time Mr. Gembarra imposed the condition. Both parties appear to read them as representations of fact as of the time of securitization because they were supposed to have happened before the loan closing in September, 2005, and therefore would be in the past as of March 30, 2006.

representative could have found out by simple inquiry to LaSalle whether the HVAC inspection had occurred and whether there had been a holdback. Indeed, because Mr. Gembara had waived the inspection shortly before the Priest loan closed and had noted the waiver on the loan approval letter, he presumably would have told a Forum representative what his notation meant if it was too cryptic to understand. (LaSalle Motion, Doc. No. 111, at 39-41). For the reasons set forth by Wells Fargo in its response, the Court believes there is a genuine issue of material fact as to whether reliance would have been reasonable. LaSalle is not entitled to summary judgment on this issue.

Lastly, LaSalle asserts there is no evidence of the required special relationship between itself and the Forum investors so as to support that necessary element of a negligent misrepresentation case (LaSalle Motion, Doc. No. 111, at 41-44). The required proof of such a relationship was set forth by the New York Court of Appeals as follows:

> [A] factfinder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust and confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

*Kimmell v. Schaefer*, 89 N.Y.2d at 264-65 (1996). LaSalle also contends there are more stringent requirements in a commercial context:

> However, where the duty arises in commercial contexts in which a contract exists, the duty attendant to that special relationship "must spring from circumstances extraneous to, and not constituting elements of the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island RR Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987). In other words, "if the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort." *Hargrave v. Oki Nursery, Inc*., 636 F.2d 897, 899 (2d Cir. 1980).

(LaSalle Motion, Doc. No.111, at 43, quoting *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401 (S.D.N.Y. 2004).

The evidence relied on by Wells Fargo to show the required "special relationship" is insufficient as a matter of law. Wells Fargo does not dispute the claim that the Forum investors were sophisticated business people. There is evidence, cited by Wells Fargo, that there was an ongoing relationship between the investors here and LaSalle. But the fact that business people do business on a continuing basis does not make their relationship into a "special relationship." The parties negotiated a very complex contract to govern their relationship on each piece of business they did. As the abundant authority cited by LaSalle shows, that does not entitle Wells Fargo to "transmogrify" a contract claim into a tort claim. On the special relationship issue, there is no genuine issue of material fact and LaSalle is entitled to judgment as a matter of law. This ruling is dispositive of Count IV of the Second Amended Complaint, on which LaSalle is also entitled to judgment as a matter of law.

## 14. Is Wells Fargo entitled to a specific performance remedy?

As part of its Prayer for Relief, Wells Fargo asks this Court to "[e]nforc[e] the MLPA and PSA by requiring LaSalle to repurchase the Rooths Loan and the Priest Loan from the Trust as specified in PSA § 2.03(b) and MLPA § 6(e) at the Repurchase Price."

LaSalle contends Wells Fargo will not be entitled to a specific performance remedy even if its prevails on Counts I and II. It argues that

> Under New York law, a plaintiff seeking specific performance must make an initial showing that (1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law.

(LaSalle Motion, Doc. No. 111, at 45, quoting *FJE Corp. v. Northville Inds. Corp.*, 198 F. Supp. 2d 249, 270 (E.D.N.Y. 2002) (citing *U.S. Fidelity and Guar. Co. v. J. United Elec. Contracting Corp.*,

62 F. Supp. 2d 915, 921 (E.D.N.Y. 1999) and *Hadcock Motors, Inc. v. Metzger*, 459 N.Y.S. 2d 634, 636-37 (4th Dep't 1983)). It continues with the familiar maxim that "[w]here money damages are adequate to compensate plaintiff for an alleged breach of contract, the extraordinary remedy of specific performance is not available. *Id.*, citing *Lucente v. Int'l Business Machines Corp.,* 310 F.3d 243, 262 (2nd Cir. 2002).

LaSalle's Motion for summary judgment on this issue is denied because LaSalle has not demonstrated that damages are easily calculable. The authority relied on by Wells Fargo establishes that, at least in some commercial mortgage-backed securities cases, courts have found that the difficulty in calculating money damages supports a specific performance decree. (Wells Fargo's Memo Opp., Doc. No. 125, at 27.)

## Conclusion

The parties' motions for summary judgment are granted in part and denied in part as set forth above.

July 7, 2009.

s/ **Michael R. Merz**<br>
United States Magistrate Judge