# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

WELLS FARGO BANK, N.A.,

      Plaintiff,                 :         Case No. 3:07-cv-449

   -vs-                                   Magistrate Judge Michael R. Merz

                                   :

LaSALLE BANK NATIONAL
ASSOCIATION,

      Defendant.

## DECISION AND ORDER

This case is before the Court on LaSalle's Renewed Motion in Limine (Doc. No. 246) which Wells Fargo opposes (Doc. No. 253); LaSalle has filed a Reply Memorandum in Support (Doc. No. 255).

LaSalle seeks first to exclude

> 1. The overall performance (including delinquency and/or default rates) of, or the underwriting or origination practices in connection with, the MFG program or the MF2 securitization as a whole;
>
> 2. Practices relating to, and the performance of, any non-MF2 LaSalle MFG securitizations; and
>
> 3. The Trepp Reports (Exhibit 67 [CN6452-6551] and 260) and any other evidence purporting to compare the delinquency rates or aspects of MFG securitizations to other securitizations.

(Motion, Doc. No. 246, at 5.) Wells Fargo has agreed in part (Doc. No. 253 at 3) and accordingly Plaintiff may not submit any evidence on the following topics:

> (1) the Trepp Report (CB6542-6551);

1

(2) the default rates of any non-LaSalle securitizations;

(3) the "power point presentation created by Bank of America in 2007;" and

(4) the circumstances under which Janice Hopper was terminated.

Wells Fargo's agreement and the Court's ruling are limited to the present state of the record and are subject to reconsideration if LaSalle introduces any evidence or makes any argument which would make this evidence relevant.

Wells Fargo says, however, that

> . . .it will seek to introduce evidence concerning the underwriting and/or origination practices for the MFG program generally; the underwriting and/or origination practices of other CMBS lenders; how the various securitizations of LaSalle (including but not limited to MF2) have performed; and Bank of America's decision to shut down the MFG program.

(Memo in Opp. Doc. No. 253, at 3-4.) Wells Fargo contends this evidence is relevant circumstantial evidence regarding breach of Representation and Warranty 23. *Id*. at 4.

To attempt to show relevance of the Bank of America decision to shut down the MFG program after it acquired LaSalle, Wells Fargo relies on this Court's decision compelling the production of those materials. Wells Fargo substantially overreads that decision. At the time of the decision, neither Wells Fargo nor the Court had seen the documents in question. The Court ruled they had to be produced in discovery in the face of LaSalle's general argument that "the overall lending situation was radically different [in 2007] than in 2005." (Quoted from Surreply, Doc. No. 69, at 4.) As the Court found, that did not "logically entail the irrelevance of the analyses" created by Bank of America; several possible relevant items were hypothesized.

But the fact that the materials were held discoverable over a very general objection to their potential relevance does not mean that the materials eventually discovered are in fact relevant. Unfortunately, even at this stage of the litigation, with trial less than a week away, the argument on this point is not focused on what particular evidence taken from the Bank of America decision

2

materials Wells Fargo wishes to introduce. To avoid potential prejudice, LaSalle's motion in limine as to the Bank of America decision is granted such that no mention of this decision shall be made in opening statement by either party unless, prior to that time, the Court has ruled that specific material (documents or testimony) from that material is to be admitted.

Wells Fargo has not yet persuaded the Court that default rates for the MFG securitizations are relevant. The evidence adverted to at page five of Wells Fargo's Memorandum in Opposition, to wit, that LaSalle employees knew that MF1 loans were originally intended to be carried on the LaSalle balance sheet whereas they knew the MF2 loans were originated with expectation they would be securitized creates part of the chain of logic. Is there any evidence that the cause of higher defaults on the MF2 than the MF1 loans is that one or more LaSalle employees decided to employ shoddier (below industry standard) practices in originating, underwriting, and securitizing those loans? How can the jury infer a particular cause (below industry standards practices) from the default rates? LaSalle's motion in limine is granted as to the default rates for the MFG securitizations unless Wells Fargo provides the Court with satisfactory evidence that it can fill this gap in the logic.

To the extent Wells Fargo can show "multiple flaws in the MFG program" which consist of flaws in the processing of loans for that program, such evidence appears to the Court relevant to showing that those flaws affected these two loans. LaSalle's motion in limine to exclude such evidence is overruled.

As the Court understands what evidence it has read, "Project 30" was not initiated until 2007. The Court agrees with Wells Fargo that there were prior efforts, demonstrated in the evidence, to reduce the amount of processing time and the evidence about those is relevant to prove the processing of these loans fell below industry standards pursuant to the common sense notion that when a person goes faster, they may not do as thorough a job. The evidence of efforts to speed up

the processing before the Priest and Rooths loans were processed is admissible. However, the term "Project 30" and specific evidence about that project are not to be mentioned.

LaSalle seeks to exclude evidence comparing Bank of America's guidelines and practices for its "conduit" program from evidence, explaining the ways in which that program is or was different from the LaSalle MFG program (Motion, Doc. No. 246, at 10). Wells Fargo responds that the evidence is admissible because David Abshier, LaSalle's expert testified, that the customary CMBS industry practices applicable in this case "would be the same. Contingent upon the timing" as other "are applicable to any other CMBS securitization." (Quoted in Doc. No. 253 at 9 from the 1/8/2009 deposition of David Abshier at 99-101.) As the Magistrate Judge's torts professor was wont to say, I get it all but the therefore. Is there somewhere in the evidence an admission by LaSalle or testimony by a witness identified with LaSalle that the Bank of America program constitutes a CMBS program as Mr. Abshier used that term? Absent a showing, which has not been made in the motion papers, that such a link exists, LaSalle's motion in limine as to the Bank of America conduit program is granted.

LaSalle seeks to exclude versions of its own underwriting guidelines other than the version effective July 1, 2005 (Motion, Doc. No. 246, at 10.) Wells Fargo argues that the loans in suit would not have been made if the subsequent versions had been in place and then argues that adoption of the later versions is not a subsequent remedial measure excludeable under Fed. R. Evid. 407 because they "were not revised in response to this litigation or any other lawsuit." Wells Fargo cites a portion of the Advisory Committee Notes to Fed. R. Evid. 407 limiting exclusion to measures taken after "an occurrence that produced the damages giving rise to the action." At least one theory of injury which Plaintiff has pursued is that the damage here (the material and adverse effect) occurred on the date of securitization. If that is the date on which the adverse effect is measured, are not guideline versions drafted after that date subsequent remedial measures taken after the injury in suit?

Even assuming that the later versions do not qualify for exclusion as subsequent remedial measures, what is their relevance to proving what customary industry practices were at the time of securitization? Absent some convincing showing of relevance which has not yet been made, the subsequent versions of the LaSalle guidelines are excluded. The versions prior to the version in effect on July 1, 2005, are also excluded unless Wells Fargo can somehow show they represent customary industry practice as of the time these loans were closed in September, 2005.

Testimony showing that any preference given at LaSalle to the sale department over the production department led to failures of the production department to deal with these two loans in accordance with customary industry practices may be admitted as well as testimony that LaSalle failed to comply with its own underwriting guidelines as to these two loans. Use of the word "dysfunctional" to describe the relationship would be prejudicial, given the connotations of the word. It is not to be used in opening statements. The Court does not purport to decide at this point whether it might be appropriate argument at the close of the case.

Wells Fargo has indicated it will not offer any evidence concerning alleged harassment of appraisers by LaSalle sales personnel and brokers (Doc. No. 253 at 13).

LaSalle seeks to exclude the testimony of Pauline Olon from Dayton Power & Light Co. on the ground that evidence was only relevant to the claim of breach of Representation and Warranty 13 which is now out of the case by reason of the Court's having granted summary judgment on that claim. Wells Fargo responds that the evidence is admissible to show a breach of Representation and Warranty 23 as well, but does not spell out its theory of relevance. Assuming that the theory is that, if LaSalle had followed customary industry underwriting practices, it would have discovered the substance of what Ms. Olon will testify to and Wells Fargo has evidence to that effect, her testimony may be admitted for that purpose.

LaSalle's motion to exclude opinion testimony from Paul Gembara is denied.

In dealing with the deposition designations for Tina Mulcahy and Patricia Rubin, the Court has already dealt with any LaSalle objections to their testimony.

October 27, 2009.

s/ **Michael R. Merz**<br>United States Magistrate Judge